THE UNITED STATES OF AMERICA, *on the Relation of* WILLIAM S. SEARCH, SAMUEL CLAY, WRIGHT CHRISTIAN, EDWARD J. KELLEY AND GEORGE A. OUTCELT v. THE CHOCTAW, OKLAHOMA & GULF RAILROAD COMPANY, *a Corporation*, GEORGE S. GOOD AND GEORGE S. GOOD & COMPANY, *a Co-Partnership*.

1. RAILROAD LAW—*Act of Congress Relating to Choctaw Railway Company*.   By act congress approved February 18, 1888, the Choctaw Coal and Railway company, a corporation, was invested and empowered with the right of locating and constructing a railway through the Indian Territory, ''by the most feasible and practicable route.''   The conditions precedent, stated in the act, were, (1) that the corporation is authorized to use a right-of-way one hundred feet in width through said territory, and (2) for all the purposes of railway, and for no other purpose, and (3) to take and use a strip of land two hundred feet in width with a length of three thousand feet, in addition to the right-of way, for stations, for every ten miles of road, and (4) the right to use such additional ground where there are heavy cuts or fills as may be necessary for the construction

and maintenance of the road-bed, not to exceed one hundred feet in width on each side of the right-of-way, and (5) that no more than such addition of land shall be taken for any one station, and (6) that no part of the lands authorized to be taken should be leased by the company, and (7) that they should not be used except in such a manner and for such purposes only as should be necessary for the construction of said railroad, and (8) that when any portion thereof shall cease to be used, such portion should revert to the nation or tribe of Indians from which the same should be taken, and (9) that full compensation should be made to individual occupants according to the laws, usages and customs of any of the nations or tribes through which it might be constructed, and (10) that in case of failure to make amicable settlement, compensation was to be determined by the appraisement of three referees, one to be appointed by the president, one by the chief of the nation to which said occupant belongs, and one by the railway company, together with provisions for appeal to the district court, and (11) that upon the hearing of the appeal, if judgment was for a larger sum than the award of the referees, the costs of appeal were to be adjudged against the railway company, and (12) that when proceedings were commenced in court, the railway company was to pay double the amount of the award into court, to abide the judgment thereof, before having the right to enter upon the property, and (13) that the railway company was to pay to the secretary of the interior, for the benefit of the particular nations or tribes through whose lands said railway may be located, the sum of fifty dollars per mile, in addition to compensation provided for in this act.   The defendant company complied with all these conditions before filing its map of survey in the department of the interior and submitting it to the secretary of the interior for his approval.   It is also provided in the act, as conditions subsequent, that (1) when any portion thereof (that is, of the land over which the right-of-way was granted) shall cease to be used, such portion shall revert to the nation or tribe of Indians from which the same shall be taken, and (2) that congress shall have certain rights, so long as said lands are occupied and possessed by said nations and tribes, etc., and in section seven, (3) that the servants of the company may reside upon the right-of-way, but subject to the provisions of the Indian Intercourse Laws, and such rules and regulations as may be established by the secretary of the interior in accordance with said Intercourse Laws, and (4) concurrent jurisdiction is provided over controversies arising between said railway company and the nations and tribes through whose territory said railway shall be constructed, in the United States circuit and district courts for the western district of Arkansas and the northern district of Texas (it being here observed that

jurisdiction over controversies is provided for between the railway company and the Indian nations or tribes alone, and not between either of them and any white citizen or citizens of the United States), and (5) that all mortgages executed by the railway company upon any portion of its railroad were to be recorded in the department of the interior. The act provided "that when a map showing any portion of said railway company's located line is filed as herein provided for, said company shall commence grading said located line within six months thereafter or such location shall be void; and said location shall be approved by the secretary of the interior in sections of twenty-five miles before construction of any such section shall be begun." By a second act of congress approved February 13, 1889, amending § 1 of the act of 1888, the company was authorized to build a branch line of railway, by the "most feasible and practicable route," to an intersection of the Atchison, Topeka & Santa Fe Railway company, in what was then the northwestern part of the Indian Territory. In 1890 the company filed in the department of the interior a map of the route running from a point near the eastern line in Oklahoma in a westerly direction within the Territory of Oklahoma, through the Pottawatomie Indian Reservation to a point about twenty-five miles east of Oklahoma City, where it connected with another section of twenty-five miles, which had been theretofore approved by the secretary of the interior. By act of congress of May 2, 1890, the lands in question had been included within the Territory of Oklahoma, subject to the provision that: "Nothing in this act shall be construed to impair any right now pertaining to any Indians or Indian tribe in said territory under the laws, agreements and treaties of the United States, or to impair the rights of personal property pertaining to said Indians, or to affect the authority of the government of the United States to make any regulation or to make any law respecting said Indians, their lands, property or other rights which it would have been competent to make if this act had not been passed." Upon the opening of the Pottawatomie reservation to white settlement, the townsite of Tecumseh was reserved under the direction of the land department for a townsite, and the county seat of Pottawatomie county was located thereupon. The map for this section, filed in 1890, was not acted upon by the secretary of the interior, and was not built upon by the railway company. The company became insolvent, its property was about to be sold under foreclosure of mortgage for the payment of its debts, and the road was, by reason thereof, reorganized in 1894 under an act of congress approved August 24, 1894, by which the defendant, the Choctaw, Oklahoma & Gulf railroad company, was incorporated and author-

ized to purchase the property and franchises of the Choctaw Coal and Railway company and was "vested with all the right, title, interest and property in and to the rights of way and property of the said company, with all the rights, powers, immunities, privileges and franchises which had hitherto been conferred upon said company," and was required to do all the things necessary to enable the said company to maintain, use and operate the railroads which it might become possessed of, in conformity with the provisions of the act of congress relating to and affecting the Choctaw Coal and Railway company. The defendant company, in pursuance of the authority here given, purchased the property, rights and franchises mentioned on the 3d day of October, 1894, and made a survey of a section of twenty five miles of the said railway from the point on the eastern line of Oklahoma to a point about twenty-five miles east of Oklahoma City, and which is designated in these proceedings as section four of its railway survey, and upon its railway map, and at the request of the secretary of the interior filed the said map in the department of the interior and presented it to him for his approval in December of 1894. The survey of 1890 was located three and a half miles from where the town of Tecumseh now is (and which was not then built or located), upon the amended map so presented to the secretary. The survey of 1894 was located between five and six miles from that town. Upon February 15, 1895, the secretary of the interior expressed his disapproval of the map filed in the department of the interior in December, 1894, except where its line coincides with the line shown upon the original map of the fourth section, filed in the Indian office in 1890. The defendant company has complied with all the conditions precedent designated above under the numbers, (1) to (13), before filing the map of survey and submitting the same to the secretary of the interior for his approval. Thereupon the defendant company proceeded to grade its line through Oklahoma and Pottawatomie counties, crossing public roads, school lands and through the Kickapoo Indian reservation, which had been several years previously set apart by executive order of the president, as a reservation for the occupancy of the Kickapoo tribe of Indians. The fee simple title to said lands was in the United States, subject to the occupancy of the Kickapoo Indians by the executive order of the president. By agreement made September 9, 1891, the Kickapoo Indians ceded and relinquished all their interest in the lands to the United States government. This agreement was ratified and confirmed by acts of congress approved May 3, 1893. The agreement provided that each of said Kickapoo Indians should receive an allotment of eighty acres, and that said allotments should be held in trust by the secretary of the interior for the individual Indians for the period of

twenty-five years, and that the allotments should not be subject to alienation, and that upon their being made, the remainder of the reservation should be opened for settlement by white citizens of the United States. Thereafter, on the 18th day of May, 1895, the president, by his proclamation of that date, declared that the said lands should be opened to settlement on the 23d day of May, 1895. The laws of Oklahoma authorize: "Any railroad corporation may, under the provisions of this article, extend its road from any point named in its charter or articles of organization, or may build branch roads either from any point on its line of road or from any point on the line of any other road connecting or to be connected with its road," etc. It is *held*, that the defendant company, having complied with all the conditions contained in the acts of congress "incorporating and authorizing" and "investing and empowering" it to locate and construct its line, and that said conditions having been imposed for the purpose of protecting the Indian interest, and said approval having been required from the secretary of the interior by § 6 of the act of 1888, for the purpose of compelling the performance of said conditions, and for the protection of the Indian interest, and said Indian interest, as such, according to the laws, customs and usages of Indian nations and tribes, having been extinguished in the land over which said section four of twenty-five miles is built, and the land now being subject to the laws of Oklahoma Territory respecting railroads, and the defendants having complied with the laws of the territory so as to authorize it to claim, and to entitle it to, the benefit of those laws, and the railroad laws of this territory not requiring the approval of the secretary of the interior, that said approval is not a necessary prerequisite to the right of said company to locate and construct its line of railroad.

2.  APPEALS—*Rules Applicable—Statutes*. The provisions of § 1001, R. S. U. S., that: "Whenever a writ of error or other process in law ＊ ·＊ ＊ issues from, or is brought up to, the supreme court, or circuit court, either of the United States, or by direction of any department of the government, no bond, obligation or security shall be required from the United States or from any party acting under the direction aforesaid, either to prosecute said suit or to answer in damages or costs," does not apply to a case which is brought up from a district court of the territory to the supreme court of the territory. The Code of Procedure from which § 1001 is taken does not relate to the territorial courts. The rule of this court, therefore applies, which requires that "No cause shall be docketed until security for costs shall be given," etc.

3.  PRACTICE IN SUPREME COURT—*Security for Costs*. The practice, pleadings and forms and modes of proceeding of the territorial

courts, as well as their respective jurisdictions subject to such conditions as are expressed in the Organic Act itself, were intended to be left to the action of the territorial legislature, and to such rules as might be adopted by the courts themselves. They are not provided for by the Civil Procedure adopted by congress, for the direction of the supreme court and circuit and district courts of the United States. The defendants are entitled to an order requiring the plaintiffs to give security for costs, to be approved by the clerk of the supreme court, conditioned for the payment of all costs for which the plaintiffs in error are liable, before they can require any further proceeding or demand any further relief.

4. ACTIONS—*Real Parties in Interest—Liability for Costs.* In an action in which the name and authority of the United States is authorized to be used by private parties as relators for the protection of private interests, such private parties would not be entitled to the benefit of a statute which provides that the United States shall be exempt from the payment of, or security for, costs upon writ of error or appeal. In such case they are the real parties in interest and subject to the same liabilities for costs as are other litigants.

5. STATUTES—*Code—Construction.* Our Code of Civil Procedure, having been adopted from the state of Kansas, this court will follow the principles of construction and interpretation which have been applied to it by the supreme court of that state.

6. NEW TRIAL—*Motion Must Be Filed, When.* The motion for a new trial must be filed in strict conformity with the provisions of of the Statute, that is, within three days after the verdict was rendered, unless it is made to appear that the party making the motion has been unavoidably prevented. And when no such showing that the party has been unavoidably prevented from filing his motion within the time specified has been made, the court cannot consider or review the errors occurring upon the trial.

7. CASE-MADE—*Time to Make Cannot Be Extended After Time Given Has Expired.* The district court or judge has no power to extend the time for making a case after the time fixed by the Statute or the time fixed by the order of the district court for extension of time for making a case-made has elapsed.

8. SAME. The district court or judge, having no jurisdiction to extend the time by a direct order to that effect, cannot do so indirectly by revoking a final judgment after it has been made, and undertaking to to make another final judgment of a later date, and by including in such later final judgment an order extending the time for making a case-made, and permitting at such later date more than three days

after verdict and judgment, a motion for a new trial to be made, after the time had expired within which the case might be made, or a motion be made for a new trial.

9.  SAME—*Insufficient Authentication to Be Entitled to Review in Supreme Court.*  Affidavits, a map, and letters, purporting to have been used as evidence at the hearing below, and an opinion of the district court brought here, annexed to the petition in error, and certified to by the clerk of the district court as "a true, full and complete copy of the proceedings and papers in the case, as the same remains on file in my office," and not having been submitted to the judge, who should settle and sign the same, does not bring the evidence here in such form as that it can be reviewed by this court.

10.  SAME—*Evidence—Record Insfficient.*  The method prescribed by the Statute for bringing evidence into this court by case-made, is the only and exclusive method by which evidence can be brought here to be reviewed and examined upon error.  A written opinion prepared and filed in the case by the judge of the district court, in which are some of the affidavits used as evidence at the hearing, and which is, by the decree, expressly made a part of the record, the decree at the same time stating that "the proofs are made a part of the record," are insufficient to bring the evidence here for examination and review.

11.  RECORD—*Opinion of Trial Court Not a Part of the Record.*  Upon trial of questions of fact by the court, if the court makes specific findings of fact and conclusions of law, and these are entered upon the journal at the request of one of the parties to the cause, although not made a part of the record by a bill of exceptions, are yet a part of the record; but the voluntary opinion of the court, although made in writing, not upon the request of one of the parties to the cause, and although it includes a statement of facts, is a general finding only. and is not a part of the record.

12.  EVIDENCE—*Not a Part of Record, When.*  No evidence, depositions, affidavits, or judge's opinion is a part of the record unless made so by being embodied in a bill of exceptions or case-made, and neither the clerk, by his certificate, nor the direction of the judge himself can be effective to incorporate these things in the record, in the absence of statutory authority.

13.  MOTION—*To Strike From Transcript Affidavits, etc., Not Part of Record.*  A motion to strike from the transcript filed in the case affidavits, certificates, letters and map purporting to have been used as evidence at the hearing below, but not brought here by case-made or bill of exceptions, for the reason that they are not a part

of the record, and so are improperly filed in the case, and to tax the costs of making those portions of the transcript to the plaintiffs, is properly made and will be sustained.

14. EVIDENCE—*Not Considered Unless Made Part of the Record.* Evidence having been produced at the hearing below, and the judgment of the court having been rendered thereon, and the evidence not having been brought here by a case-made, or bill of exceptions, this court will not go into an examination as to whether the trial judge erred in rendering the judgment which he did. Every presumption is in favor of the correctness of the finding of the trial court upon the facts, if it is a court of general jurisdiction, until the contrary is made to affirmatively appear.

15. JUDGMENT ON PLEADINGS—*Rule.* Upon a motion for judgment upon the pleadings, the rule is, that if the motion has not been made in the trial court, and the opposite party thereby notified of defects which he would be entitled to amend in furtherance of justice, and an opportunity afforded to the trial court to consider and pass upon the questions involved, and the motion is made for the first time in this court, the party making the motion is not entitled to relief, but the judgment will be affirmed without looking into the merits of the action.

16. ACTIONS—*Parties to—Rights Must Clearly Appear.* If an action is prosecuted in the name of the government upon the relation of individuals, the individuals who thus prosecute the action must be the real parties in interest. If the object of the proceeding is to compel the performance of a public duty or to restrain the commission of a public wrong, the people are regarded as the real party in interest, and the action must be brought in the name of the territory upon the relation of the prosecuting officer, or upon the relation of some member of the public, who has a personal interest in the result. If the relief is sought merely for the protection of private rights, the relator must show some special interest in the matter in litigation, since he is regarded as the real party. His rights must clearly appear.

17. SAME—*Pleadings Must Show What.* In an action for the prevention of a public nuisance, the petition must show that the relators have suffered some special or peculiar injury shared by the public alike, in order to sustain the action.

18. SAME—*Suit Brought by United States.* If suit is brought by the United States for the protection of some private interest, it must appear that there is some obligation subsisting under which it is incumbent upon the United States to litigate in behalf of the public, or of those who offer themselves as relators in the proposed

litigation.   If these conditions do not appear, the litigation cannot be sustained.

19.  STATUTE—*Amendment.*   An amendment to an act of congress, which by its provisions is but an amendment to a single section of that act. is made and must be accepted subject to all the provisions of the original act which has been amended.

20.  RAILWAY LAW—*Special Acts of Congress.*   The fact that a railway corporation has been incorporated under a special act of congress which provides special conditions under which the company must accept the benefits therein provided, and which provides for the protection of special interests, will not .prevent such corporation from complying with a general railway law of this territory, and accepting and availing itself of the benefits thereof, when the special conditions under which it was originally incorporated have been fulfilled, and when the special interests requiring protection at the time of the original incorporation no longer exist.

21.  PARTIES—*Misjoinder of—United States Not the Real Party in Interest.*   It cannot be claimed that this is an action in which the United States itself is the real party in interest.   If it were in fact so, and this is a proceeding in which the United States is the real party in interest, there would then be a misjoinder of parties.   The action would be the action of the United States, in which the relators have been improperly joined.

22.  INDIAN LANDS — *Occupancy — Customs and Usages.*   Individual occupancy of land is in pursuance of, and a part of, the laws, customs and usages of the Indian tribes, who have a right of occupancy, only, upon the public domain of the United States, under executive order, as it is, also, by tribes occupying such lands as are held in fee simple by the tribes themselves.

23.  RAILROAD—*Act of Congress for Benefit Of.*   A provision of an act of congress empowering a railway company to locate its line ''by the most feasible and practicable route,'' is a provision intended for the benefit of the railroad company, in order that it may provide for the most economical line, and that which would be most beneficial to the commercial objects and purposes which it has in view in constructing its line, and for the cheaper and more advantageous transportation of the persons and property of the public.

24.  INDIAN TITLES—*Extinguished by Agreement—Allotments.*   An Indian tribe having made an agreement with the United States upon September 9, 1891, by which it agreed to cede all its interest in certain lands theretofore occupied as a reservation, and congress having ratified such agreement upon the 3d day of May, 1893,

and certain allotments having been provided by such agreement for the individual Indians of such tribe, and such individual Indans having accepted such allotments, the interest of the Indian tribe in the lands agreed to be ceded by such agreement became thereby extinguished.

*Error from the District Court of Pottawatomie County.*

STATEMENT OF THE CASE.

This is an injunction proceeding in which the plaintiff below, plaintiff in error here, prayed that an injunction be issued commanding each and every of the defendants, their officers, servants, employes, agents, contractors and workmen and all persons acting for or representing the defendants, to refrain from any further construction, or completing, a railroad described in the bill of complaint upon the line of its proposed location, as shown by a map filed in the office of the secretary of the interior in the year 1894, and from building, constructing, maintaining, operating, or in any manner using, a railroad upon the location shown by said map, or any other line or route whatsoever, without the approval of the secretary of the interior first being had as provided by the laws of the United States, and that upon the hearing of the cause the order be made perpetual, and for further relief. The case appears from the pleadings herewith given.

The bill of complaint was filed on the 19th day of March, 1895, in the district court for Pottawatomie county, Third judicial district, and sets forth that the United States of America, by Richard Olney, attorney general of the United States, on the relation of William S. Search, Samuel Clay, Wright Christian, Edward J. Kelley and George A. Outcelt, presents this bill of complaint against the Choctaw, Oklahoma & Gulf Railroad company, a corporation organized and

existing under and in pursuance of the provisions of the act of congress approved August 24, 1894, and entitled, "An Act to Authorize Purchasers of the Property and Franchises of the Choctaw Coal and Railway Company, to Organize a Corporation and to Confer Upon the Same all the Powers, Privileges and Franchises Vested in the Company," and George S. Good and George S. Good & company, a co-partnership.

Plaintiffs say, that by act of congress approved February 18, 1888, as amended by the acts of congress approved February 13, 1889, entitled, "An Act to Amend an Act Entitled, 'An Act to Authorize the Choctaw Coal and Railway Company to Construct and Operate a Railway Through the Indian Territory' and for Other Purposes," approved February 18, 1888, the Choctaw, Coal and Railway company, a corporation organized and existing under the laws of the state of Minnesota, was granted a right of way for a railroad with the right of locating, constructing, owning, equipping, operating, using, and maintaining a railway, telegraph and telephone lines though the Indian Territory, beginning at a point on Red River    *    *    *    in the Indian Territory, and running thence by the most feasible and practicable route through the said Indian Territory to a point on the east boundary line immediately contiguous to the west boundary line of the state of Arkansas, also a branch line of railroad to be constructed from the most suitable point on the main line for obtaining a feasible and practicable route in a westerly or northwesterly direction to the leased coal veins of the Choctaw Coal and Railway company in Tobucksey county, Choctaw Nation, and thence by the most feasible and practicable route to an intersection with the Atchison, Topeka & Santa Fe railway, at the most convenient point between Halifaw station and Ear Creek, otherwise known as the North Fork of the Canadian river, and that in and by said act of con-

gress as so amended, it is provided that the said Choctaw Coal and Railway company should cause maps, showing the route of its located lines through said territory, to be filed in the office of the secretary of the interior, and that the location of said lines should be approved by the secretary of the interior, in sections of twenty-five miles, before the construction of any such section should be begun.

That the point of junction of the branch line of the said Choctaw Coal and Railway company with the Atchison, Topeka & Santa Fe railway, as selected, is located in what is now Oklahoma county, in Oklahoma Territory, formerly constituting a part of the Indian Territory.

By subsequent acts of congress the time for the completion of said railroad lines was extended until February, of the year 1896.

In the year 1890, the Choctaw, Coal and Railway company filed in the office of the secretary of the interior a map of the fourth section (of 25 miles or thereabouts) of its said branch road extending from its main line to the proposed junction with the Atchison, Topeka & Santa Fe railway, but the map and the location of section four, as shown thereby, were never approved by the secretary of the interior, nor was any action ever taken by the secretary of the interior in relation thereto, nor was any effort ever made by the Choctaw Coal and Railway company to build thereon, but on the contrary, the matter on the said map, and of the location of the said road as therein described, has been suffered to lapse and become of no legal effect.

That the Choctaw Coal and Railway company, having become insolvent, as recited in the aforesaid act of congress, of August 24, 1894, the right of way, property and franchises of the Choctaw Coal and

Railway company were sold under judicial process and decree of a court having jurisdiction in the premises, and thereupon the purchasers at the said judicial sale and acting under and by virtue of the provisions of the act of congress of August 24, 1894, organized in accordance with said provisions the defendant corporation, the Choctaw, Oklahoma & Gulf Railway company.

Whereby the complainant insisted that the Choctaw, Oklahoma & Gulf Railway company succeeded to and became the owners of said Choctaw Coal and Railway company, and became bound by the same limitations and provisions of law in regard to the use, enjoyment and exercise of the same, that had been obligatory upon the Choctaw Coal and Railway company.

That the Choctaw, Oklahoma & Gulf Railway company did not claim to possess any corporate right, franchise, or privilege other than it derives from the aforesaid acts of congress.

That on or about the — day of December, in the year 1894, the Choctaw, Oklahoma & Gulf Railroad company filed in the office of the secretary of the interior, in compliance with the provisions of the aforesaid acts of 1888, a map of the route and location of the fourth section of its proposed line of railway from its main line to the junction with the Atchison, Topeka & Santa Fe railway, of which said map and location, proof was to be made, which section begins at or about section four, township eleven, north range two, east of the Indian meridian in Oklahoma county, Territory of Oklahoma, and thence running in an easterly, or slightly southeasterly direction, about six miles through the county of Oklahoma, and about seven and a half miles through the Kickapoo Indian reservation, and about eleven miles in Pottawatomie county in said territory of Oklahoma.

That the map and the location of railway thereby exhibited have never been approved by the secretary of the interior, nor has his consent for construction of the branch line of railway upon the route indicated, ever been granted, but on the contrary, and on or about the 15th day of February, 1895, the secretary of the interior did disapprove in part, the proposed location by writing on the map over his signature the words and figures:

"DEPARTMENT OF THE INTERIOR, Feb. 15, 1895.

"The within map is hereby disapproved except where said line coincides with the line shown upon the original map of the fourth section, filed in the Indian office in 1890.        HOKE SMITH, Secretary."

That the original map of the fourth section thus referred to by the secretary of the interior as having been filed in 1890, is the unapproved map heretofore referred to, of the Choctaw Coal and Railway, with which the location as shown by the map of the defendant railroad company, filed in 1894, does not coincide throughout, but on the contrary, widely departs therefrom, from and between section thirty-five, township ten, north range four, east of the Indian meridian, in Oklahoma Territory, in Pottawatomie county, and section thirty-six, township eleven, north range two, east of the Indian meridian in Oklahoma county, said divergent line passing through the Kickapoo Indian reservation.

The complaint further shows that no map of the location of the fourth section of the railroad has been approved in whole, or in part, by the secretary of the interior.

And the plaintiff alleges and charges that, under the acts of congress aforesaid, it was and is (not) lawful for the Choctaw, Oklahoma & Gulf Railroad company to construct its railroad upon the location so disapproved as aforesaid, or upon any part of the

fourth section thereof, or in any location, without the approval, authority and consent of the secretary of the interior, for that purpose to be first had and obtained.

Nevertheless, in disregard of said disapproval and without any approval by the secretary of the interior, of the location shown by the map of 1894, the Choctaw, Oklahoma & Gulf Railroad company, its officers, agents and employes, and the said other defendants, who are contractors with and under the said last named railroad company, for the performance of certain labor or the furnishing of material, or both, in the construction of said road, have begun the construction of said road upon the location of section four, as shown by the map of 1894, and have cut and removed timber from the location, and have graded the line upon the location or portions thereof, upon the said section, as well as upon that part thereof disapproved by the secretary of the interior, as aforesaid, as upon that part of the section whereupon the location, while not affirmatively disapproved, has not been approved, and the defendants, their officers, agents and employes and servants are now constructing the railroad upon section four, and are threatening to, and intending to, continue such construction thereon to completion, and the railroad company threatens to use and operate the road, when constructed, over and upon section four, with its engines and cars, for the transportation of passengers and freight in the conduct of its railroad business.

That such construction has been over, across and upon public highways, some of the highways being in Pottawatomie county and others in Oklahoma county and others in the Kickapoo Indian reservation, said Kickapoo Indian reservation being surveyed lands of the United States, divided into townships, sections and quarter sections, and that said highways,

in each of the said counties, are, and for several years last past have been, dedicated to public use as public roads. Complainant charges that the construction of the railroad by the defendants, and each of them, both the part already done and also that part threatened and contemplated to be constructed, is an encroachment upon the lands of the United States, an invasion of the rights of the United States in said lands and highways, an injury to the right of use by the public of such highways, and is a public nuisance.

The section of road in question, extends from and between section sixteen, township nineteen, north range five west of the Indian meridian in Pottawatomie county, to section four, township eleven, north of range two east of said Indian meridian in Oklahoma county, and the proposed location of said section, as shown by the map of 1894, runs over and across section sixteen, township nine, north range five east of the Indian meridian, and section thirty-six in township ten, north range four east of the Indian meridian, known as public school lands, and part of the lands of the United States, both sections lying in Pottawatomie county, and also through the allotments of lands to Samuel Wilson, Japtha Wilson and others, all being Indians, holding their allotments as members of the Shawnee and Pottawatomie Indian tribes, from the United States under contract, and by patents similar in provision and character, to those hereinafter described as made with, and granted to, the Kickapoo Indians; said contracts being made in the year 1890, and the patents providing for a trusteeship by the United States, and a restriction of the powers of the Indians to convey or incumber such allotments for twenty-five years thereafter, under which contracts and patents said Indians yet hold their respective allotments, said allotments being in Pottawatomie county; also

through, over and across section thirty-six, township eleven, range two east of the Indian meridian in Oklahoma county, known as public school lands and parts of the land of the United States.

That the land in the Kickapoo Indian reservation over which the proposed line is intended to pass, has, under agreement made by the United States with the Kickapoo Indian tribe, dated June 21, 1891, and ratified and set out in the act of congress approved March 3, 1893, been allotted to members of the Indian tribe, except to-wit: One section which remains the property of the United States.

That under the contract between the United States and the Kickapoo Indians, the patents for the lands so allotted, some of them have been and others are to be issued to said Indians, are made with the condition that the United States shall hold these lands in trust for the patentees, for the period of twenty-five years from the date of the contract, (or patent), at the end of which period, (unless such period is extended by the president of the United States), patents in fee simple shall be issued to the said allottees respectively, who are prohibited during the continuance of the said twenty-five years, from alienating any part of the said lands. That said allotments are yet held by the said Indians under the contract and act of congress.

That said Kickapoo Indian reservation has not by proclamation of the president of the United States been restored to the public domain.

The bill of complaint closes with the prayer for relief, as set forth above, and is signed by Richard Olney, attorney general and is verified by the relators severally and respectively, as true, except as to the maps, contracts and agreements with the Kickapoos, and acts of congress which are verified upon knowledge and belief.

Thereupon and in connection with the bill of com-

plaint, the relators filed their agreement and obligation in this court in the following terms, after entitling the obligation and agreement with the title of the cause :

" William S. Search, Samuel Clay, Wright Christian and George A. Outcelt and Edward J. Kelley, hereby agree that their names shall be used as relators in the above entitled cause, and that they will be responsible to the United States for its costs incurred therein."

" (Signed.)                    " WILLIAM S. SEARCH,
                               " SAMUEL CLAY,
                               " WRIGHT CHRISTIAN,
                               " EDWARD J. KELLEY,
                               " G. A. OUTCELT."

Summons issued upon the same day upon which the petition was filed, and upon the next, the 20th day of May, 1895, a temporary injunction was granted, as prayed, and was issued by the clerk, the original of which has, as stated in the transcript, been lost, and a copy of which cannot be supplied.

The defendant, the Choctaw, Oklahoma & Gulf Railroad company, filed its answer herein upon the 17th day of April, 1895, in the following terms:

"Comes now the defendants and for separate answers to the petition in this cause, severally deny all and singular the allegations therein contained except such as are hereinafter expressly admitted, and aver that they have a full and complete answer to the petition filed herein and aver:

"1. That by virtue of the powers conferred upon the railroad company by the act of congress, approved August 24, 1894, and the conveyance made in pursuance of the decree of the United States court in the Indian Territory and of Oklahoma Territory, the said company was invested and empowered with full authority to locate its line of railroad in Oklahoma Territory, without any supervision or interference whatever by the secretary of the interior. That under the act of February 18, 1888, conferring upon the Choctaw, Coal and Railway company, the right to

build said lines, and under the laws of the territory of Oklahoma, to all of which rights the defendant company, under the act of August 24, 1894, succeeded, the defendant was invested with the sole right of locating said line, and the secretary of the interior had no legal right to approve or disapprove said location.

"2. That immediately after the passage of the act of August 24, 1894, and in pursuance of said act, and by virtue of the powers conferred upon it by said act, the defendant, the Choctaw, Oklahoma & Gulf Railroad company, began to make surveys between South McAllister and Oklahoma City, for the purpose of making a location of the railroad it was authorized to build under said act, and to secure the most feasible and practicable route for the same. And on or about November 1, 1894, the engineers of the company made a selection of the line covered by the map number four in question, and reported the same to the company, which line was afterwards adopted and approved by the board of directors of said company. That said line was on the most feasible and practicable route and was the shortest and cheapest available route between said points. That the location was made by said company in good faith, governed solely be a desire to secure the shortest and best line.

"3. Notwithstanding the fact that the secretary of the interior had no legal authority in the premises, he assumed the right to control the location of the said line in Oklahoma Territory, and after the company had made its location, and had commenced work on the same, the secretary requested the company to submit to him a map of its location over the twenty-five miles in question for his approval, and at the same time notified the company that he would not permit it to construct any portion of its road without his approval. And while the company did not admit the secretary's authority to, in any way control the location of its line in Oklahoma territory, or concede or admit the obligation or necessity of securing his approval, yet in deference to the wishes of the secretary, it submitted to him the map of the location in question, knowing that the line selected was the shortest, most feasible and practicable, and knowing that it could in no way prejudice its rights, and believing that the

only object of the secretary was to secure the most feasible and practicable route, it did then file with the secretary a map of the twenty-five mile section in controversy, which map is the one referred to in the petition filed in this cause.     At about this time the relators in this case, who constituted a committee said to represent the town of Tecumseh, in Oklahoma Territory, through their counsel, asked the secretary to withhold approval of the map, upon the ground that a line could be located through the town of Tecumseh, which would be no more expensive, and would be as practicable and feasible as the line which the company had located.     The secretary then appointed a time for the hearing of the matter, at which time, the counsel for the relators affirmed that a line through Tecumseh could be located which would be as short and as cheap as the company's line, which statement was denied upon behalf of the company, and thereupon, the secretary of the interior stated that in view of these conflicting statements he would be glad to obtain a report from an engineer to be selected by him. which suggestion was approved and acquiesced in by the parties, and thereupon, at the secretary's request, the representatives of the relators and of the company joined in a telegram to James Dun, chief engineer of the Atchison, Topeka & Santa Fe Railroad company, requesting him to designate an engineer to make the examination suggested by the secretary and to report the results thereof, and thereupon such telegram was sent in the form following, which was prepared and dictated by the secretary himself.

"WASHINGTON, December 20, 1895.

"*James Dun, Atchison, Topeka & Santa Fe Railroad, Topeka, Kansas.*

"Upon the application of the Choctaw railroad for approval of its map, objection has been made by the people of Tecumseh.     The line proposed by the Choctaw road runs six miles north of Tecumseh, and the claim is made that it is four miles shorter and costs about two hundred thousand dollars less than a line running through Tecumseh.     The secretary desires to know whether this line is more feasible and practicable than a line through Tecumseh, and to what extent, if any, it is cheaper and shorter.     Also,

what difference will be required between the two lines
as to grade. The secretary decided to refer this ques-
tion to a competent engineer, and, with his approval,
we request that you name such engineer, to act in
conjunction with Mr. J. P. Hinckley, chief engineer
of the Choctaw railroad, whose address is South Mc-
Alester, Indian Territory. Will you please name such
engineer as soon as possible and advise Mr. Hinckley,
Mr. Horace Speed, at Guthrie, Oklahoma, and George
A. Outcelt, at Tecumseh, sending telegram to latter
place by Norman, Oklahoma?

"Horace Speed.
"Francis I. Gowan."

"At the said hearing, and prior to the sending of
the telegram, and after the parties had agreed to the
suggestion for an independent at investigation, the
secretary declared and stated, that if the investi-
gation showed that a line through Tecumseh would
be either materially more expensive or materially
longer, that he would then approve the line as located
by the company. Afterwards, on the 26th day of
December, 1894, the secretary of the interior sent to
James Dun the following telegram:

"Washington, December 26, 1894.

"*James Dun, Chief Engineer Atchison, Topeka & Santa Fe
Railroad, Topeka, Kansas.*

" There is a difference between the Choctaw, Okla-
homa & Gulf road and the people of Tecumseh in
regard to the location of their line. I have deter-
mined, after conference with the representatives of
both parties, to request you to appoint an engineer to
go over these lines with the Choctaw engineer and
report to me the difference in cost and distance be-
tween the two lines. This will probably require work
of twenty-five miles of road. Two lines have been
run by the railroad in the neighborhood of Tecumseh.
It is claimed by the railroad authorities that the one
six miles north of Tecumseh is four miles shorter and
will cost in the neighborhood of $200,000 less than the
road through, or near, Tecumseh. Please notify the
chief engineer of the Choctaw road, by wire, of your
selection, and where your engineer will meet him;
also notify the mayor of Tecumseh.

"Hoke Smith, Secretary."

"Pursuant to the request contained in said telegram, one H. L. Marvin was named by the said Dun as the engineer to make the examination in question, and after the sending of said telegram, the secretary requested one W. T. Griswold, an engineer attached to the geological survey in Washington, to act in conjunction with the said Marvin in making an examination.

"4. That as soon as the suggestion by the secretary for an independent investigation and report was agreed to by the parties, the relators, under the instruction of their chief counsel, employed a private engineer, one P. G. Burns, to survey the line through Tecumseh, who immediately commenced the survey of said line, and when the said Marvin and Griswold arrived on the ground, finding that the said Burns had the survey of his line nearly completed, and being satisfied from the topography of the country and from the results of the survey of said Burns that the same could not help showing the impracticability of the line through Tecumseh as compared with the company's line, they did not make any independent survey themselves, but confined their investigation to a personal examination of the country, and when the survey of said Burns was completed they took his figures as to the length and cost of said line, and based their report thereon, which figures as to the length and cost of said line the company did not, and it does not now, accept as correct, but both of said reports showed conclusively that the line through Tecumseh was both materially longer and more expensive than the company's located line, and thereupon the secretary stated to the representative of the company that these reports had satisfied him, and that he ought not consider a line through Tecumseh, and that he would, therefore, give no further consideration to such a line.

"5. And thereupon the relators again, through their representative or counsel, appeared before the secretary for the purpose of endeavoring to induce him to still withhold his approval of the map of location filed by the company, upon the ground that another line which would pass about three and a half miles distant from the town of Tecumseh, known as

the line south of the river, was an equally practicable line, and thereupon the secretary, notwithstanding his declaration that he would approve the company's line if the line through Tecumseh proved to be longer or less practicable, did give further consideration to the matter of approving said line, and finally agreed that if the said relators would procure for the company, free of all cost to it, the right of way on the line south of the river, suggested by them, that he would decide whether or not he would approve the company's line, and gave the relators two weeks' time within which to secure said right of way, and suspend all further action upon said matter for that time.

"6. That at the expiration of the time allowed by the secretary for this purpose, the said relators were able to procure deed for only a small portion of the right of way which they had secured, and even the deeds produced were shown to have been executed under such circumstances as would have made them illegal and worthless as conveyances, had the company thereafter undertaken to construct its railway on said line, but notwithstanding the fact that the company had then secured the right of way on its located line and had a large portion of the same graded, and notwithstanding, substantially all the allottees on the proposed line south of the river were objecting and protesting against the construction of the road over their lands, and notwithstanding the fact that the relators had utterly failed to procure the right of way as proposed by the secretary, and notwithstanding the further fact that the proposed line south of the river was deemed by all concerned, to be three-fourths of a mile longer than the company's located line, yet the secretary of the interior still continued to hold the matter of the approval of said map under consideration, until finally on the 15th day of February, 1895, he returned to the defendant company the map in question with the following endorsement:

"DEPARTMENT of THE INTERIOR, Feb. 15, 1895.
"The within map is hereby disapproved except where said line coincides with the line shown upon the original map of the fourth section, filed in the Indian office in 1890.    HOKE SMITH, Secretary."

"7. The defendant company further averred that after the declaration made by the secretary, that he would approve the company's line if one through Tecumseh was found to be impracticable, the work of grading the line as located by the company was continued in reliance upon said declaration by the secretary and upon the belief, which turned out to be well founded, that the reports of the engineers would show that the line through Tecumseh was impracticable, and said twenty-five miles had been about four-fifths graded at an expense of about eighty thousand dollars, which sum would be wholly lost to the company should it be prevented from building upon such a line. After the secretary became convinced that the location of the line through Tecumseh was out of the question, and after he had abandoned all idea of trying to compel the company to build through Tecumseh, the only reason stated by him to the representatives of the company for withholding the approval of the said map, and for finally disapproving the same, was that he wished to prevent the railroad from being built through the town of Shawnee, which was situated upon the line as located by the company, and this because he did not want the company to derive any benefit or advantage from the increase in value of certain lands which had been conveyed to the company by property owners of the town of Shawnee, for the purpose of aiding and assisting the company in the construction of its railroad.   At no time did the secretary assert or claim that the line located by the company was not the shortest and most correct line that could be adopted, but on the contrary, admitted the same, and all the reports which he had upon the subject showed this to be the fact, and no other reason did in fact exist than the determination on the part of the secretary to deprive the company of the benefit of the free gift of lands in the town of Shawnee.

"Wherefore, the defendants averred that, even conceding the propriety and necessity of the company's securing the approval of its line by the secretary of the interior, the action of the secretary in disapproving said location was without legal justification, and defendants further averred that after his declaration as aforesaid, and the company's reliance thereon, the

secretary of the interior was stopped from thereafter disapproving said line and, as a matter of law, must be held to have approved the same, so far as it affects the question of the company's right to construct its railroad over the said twenty-five mile section."

Further answering, the defendants admitted the enactment of the acts of congress approved respectively, August 24, 1894, February 18, 1888, February 13, 1889, February 21, 1891, and January 22, 1894, the insolvency of the Choctaw Coal and Railway company, and the purchase of its property by the defendants as authorized by the act of congress of August 24, 1894, and the extension of time for the construction of the railroad therein authorized, to February 18, 1896, and alleged that all of the said acts of congress are, by the above references, made a part of the defendants' answer.

Defendants further averred that the said Choctaw Coal and Railway company and defendants, the Choctaw, Oklahoma & Gulf Railroad company, were, by said acts of congress, in addition to the grants enumerated, granted the right to take and use for all the purposes of a railway, a right of way, one hundred feet in width, through said Indian Territory, for said main line, and through said Indian and Oklahoma Territories for said branch line, and to take and use a strip of land, two hundred feet in width, for a length of three thousand feet, in addition to the right of way, for stations for every ten miles of road.   *   *   *   and to construct, use and maintain such turnouts, branches and sidings, and extensions, as said companies may deem to their interest to construct along and upon the right of way and depot grounds.

Defendants further answering, averred that said Choctaw, Coal and Railway company before the sale and transfer of said railroad and property as aforesaid, and prior to May 2, 1890, located sections one, two

and three of said branch road, wholly within Okla-
homa Territory. Section one begins at the west end
of section four and extends in a westerly or north-
westerly direction, a distance of twenty-five miles;
section two begins at the west end of section one and
extends in a westerly or northwesterly direction, a
distance of twenty-five miles; section three begins at
the west end of section two and extends in a westerly
or northwesterly direction, a distance of nearly fifteen
miles; that before said sale, and prior to May 2, 1890,
said company caused maps, showing the route of its
said located line over sections one, two and three, to
be filed in the office of the secretary of the interior,
which locations were by him approved; that prior to
said sale, said company located twenty-five miles of
the said branch of the road, beginning at the east end
thereof in the Indian Territory, and extending in a
westerly or northwesterly direction said distance, the
same being section nine, and caused a map showing
the route of said located line to be filed in the office
of the secretary of the interior, who approved said
location; that subsequent to said sale the defendants,
the Choctaw, Oklahoma & Gulf Railroad company,
located its said line from the west end of section nine
to the east end of section four, and caused maps show-
ing the route of said located line to be filed in the
office of the secretary of the interior, which were ap-
proved by him; said sections were numbered five, six
and eight, respectively, and are wholly within the
boundaries of the Indian Territory, and were also filed
in the offices of the principal chiefs of the nations or
tribes of Indians through whose lands said line was
located.

Defendants further averred, that said Choctaw Coal
and Railway company before said sale, constructed
said railroad over sections two, three and nine and
operated the same; that since said purchase, defend-

ants, the Choctaw, Oklahoma & Gulf Railroad company, has operated its road over said sections and has graded said sections one, five, six and eight at a great expense and is ready to lay track thereon.

Defendants further averred that on or about the 1st day of November, 1894, the defendants, the Choctaw, Oklahoma & Gulf Railroad company, located its said line between the east end of section one and the west end of section five, a distance of twenty-five miles, and numbered it section four, the same being the section referred to in plaintiff's petition; that its said line over said section was so located on the most feasible and practicable route; that on or about December 1, 1894, it caused a map of the said route of its said located line to be filed in the office of the secretary of the interior, and the defendant company has complied with all the conditions of said acts of congress to authorize it to construct said section, and after such compliance defendants entered thereon, graded and otherwise prepared the road-bed for the track at an expense of eighty thousand dollars, and were ready to complete said road over said section, when they were stopped from proceeding further by these injunction proceedings.

Defendants averred that all of section four is within the Territory of Oklahoma, as created and organized by an act of congress approved May 2, 1890.

II. And defendants for a separate and second defense to the bill of complaint in this cause, severally denied all and singular the allegations therein contained, except such as are expressly admitted, and then after having repeated the admissions as before made the defendants further averred that the Choctaw Coal and Railway company before said sale, constructed said railroad over sections two, three and nine and operated the same, the secretary of the interior having approved the location of the same, and that

·since the purchase the defendant, the Choctaw, Oklahoma & Gulf Railroad company, has operated its road over the sections, and has graded said sections one, five, six and eight at a great expense, and is ready to lay track thereon.

That on or about the 1st day of November, 1894, the defendant, the Choctaw, Oklahoma & Gulf Railroad company, located its line between the east end of section one, and the west end of section five, a distance of nearly twenty-five miles, and numbered it section four, the same being the one referred to in plaintiff's petition; that its said line over said section was so located on the most feasible and practicable route; that on or about December 1, 1894, it caused a map of the route of its located line to be filed in the office of the secretary of the interior, fully complying with the requirements of the law, and of the secretary of the interior in that regard; that the defendant, the Choctaw, Oklahoma & Gulf Railroad company, had then and has to this time, complied with all the conditions of said acts of congress to entitle it to begin work, build and operate its road over and on section four of its located line; that the secretary of the interior on the 15th day of February, 1895, refused to approve said plat, for the reason that he wanted the defendant, the Choctaw, Oklahoma & Gulf Railroad company, to build its said road over a different route than the one designated by said map of section four, and over one to be by him selected, and not because said route designated on said map passed over public lands, Indian reservations, school lands, public highways, nor any other reason than that above given; that the route which the secretary of the interior desired to select for the section was not the most feasible or practicable one, and that his disapproval of said plat was mainly for the purpose of accommodating and pleasing private individuals who desire to

control the location of the route over section four for their individual and private gain, without any regard for the rights of the defendant company, or the rights of those to be affected by the construction of the road, or for carrying out his private views in this land as to the construction of railroads; that the defendant company has complied with all of the conditions of the acts of congress to authorize it to construct said section, and after such compliance, defendants entered thereon, graded and otherwise prepared the roadbed for the track at an expense of eighty thousand dollars, and were ready to complete the road over the said section, when it was stopped from proceeding further by these injunction proceedings, and averred that all of section four is within the Territory of Oklahoma as created and organized by an act of congress approved May 2, 1890.

III.    Defendants, for a third reason and separate defense to the bill of complaint in this cause, severally denied all and singular the allegations therein contained, except such as are hereinafter expressly admitted, and having made the admissions of acts of congress. etc., as hereinbefore recited, proceeded to aver that all of section four is within the territory of Oklahoma, as created and organized by an act of congress approved May 2, 1890, and within Pottawatomie county, of said territory, and under the jurisdiction of the territorial court and authorities in said county, and subject to the territorial laws.

Further answering, the defendants averred that, in addition to the grants contained in the said several acts of congress, the defendant, the Choctaw, Oklahoma & Gulf Railroad company, has the right to construct, equip and operate its road over and upon the route designated on the said map of section four, under and by virtue of the laws of the Territory of Oklahoma; that said company, by resolution of its

directors, entered in the records of its proceedings, designated the route of its said road from the west line of the Seminole nation, Indian Territory, to Fort Reno, Oklahoma Territory, in the manner and as required by the president and secretary of said company, in the office of the secretary of said territory, and caused the same to be recorded as provided by law; that the route designated by said resolution begins at the east end of section four and extends westward to the west end thereof, on the route designated on map of section four, and is in every respect the same route.

Defendants, further answering, averred that defendant, the Choctaw, Oklahoma & Gulf Railroad company, has purchased of the owners and occupants, and have releases and warranty deeds from such owners and occupants, conveying to it, for the right of way and station purposes, all lands over which said route on section four, as designated by the map thereof, runs, for the width and to the extent granted by said act of congress and authorized to be taken by the laws of said territory, and which it was authorized to take, receive and purchase under the laws of the United States.

The defendants, having answered, thereupon prayed the court that the injunction be dissolved, the petition dismissed, and the defendants discharged with costs, and for other and further relief. The answer was sworn to by the president of the defendant company, upon knowledge and belief.

No reply was filed by the plaintiff.

Upon the issues thus joined, the testimony submitted by affidavits, as set forth above, and the acts of congress authorizing the Choctaw Coal and Railway company to construct and operate a line of railway as herein set out, the case was submitted to the

judge at chambers on the 23d day of April, 1895, upon printed briefs and oral argument.

The acts of congress referred to in the pleadings, or so much of them as relate to the matters at issue in the case, are herewith given:

" An Act to Authorize the Choctaw Coal and Railway Company to Construct and Operate a Railroad Through the Indian Territory, and for other purposes.

" *Be it Enacted by the Senate and House of Representatives of the United States of America in Congress Assembled:*

"That the Choctaw Coal and Railway company, a corporation created under and by virtue of the laws of the state of Minnesota, be and the same is hereby invested and empowered with the right of locating, constructing, owning, equipping, operating, using and maintaining a railway and telegraph and telephone lines through the Indian Territory, beginning at a point on the Red river, the southern boundary line, at the bluff known as 'Rockey Cliff' in the Indian Territory, and running thence by the most feasible and practicable route through the said Indian Territory to a point on the east boundary line, immediately contiguous to the west boundary line of Polk and Sevier counties in the state of Arkansas; also a branch line of railway to be constructed from the most suitable point on said main line for obtaining a feasible and practicable route in a northwesterly direction to the leased coal veins of said Choctaw Coal and Railway company in Tobucksey county, Choctaw Nation; with the right to construct, use and maintain such tracks, turnouts, branches, and sidings and extensions as said company may deem it in their interest to construct along and upon the right of way, and depot grounds herein provided for.

"Sec. 2. That said corporation is authorized to take and use for all purposes of railway, and for no other purpose, a right of way one hundred feet in width through said Indian Territory for said main line and branch of the Choctaw Coal and Railway company, and to take and use a strip of land two hun-

dred feet in width, with a length of three thousand feet, in addition to the right of way, for stations, for every ten miles of road, with the right to use such additional grounds, where there are heavy cuts or fills, as may be necessary for the construction and maintenance of the road bed, not exceeding one hundred feet in width on each side of said right of way, or as much thereof as there may be included in said cut or fill: *Provided*, that no more than said addition of land shall be taken for any one station: *Provided further*, that no part of the land herein authorized to be taken shall be leased or sold by the company, and it shall be used in such manner and for such purposes only as shall be necessary for the construction and convenient operation of said railroad, telegraph and telephone lines; and when any portion shall cease to be used, such portion shall revert to the nation or tribe of Indians from which the same shall be taken.

"SEC. 3. That before said railway shall be constructed through any lands held by individual occupants according to the laws, customs and usages of any of the Indian nations or tribes through which it may be constructed, full compensation shall be made to such occupants for all property to be taken, or damage done by reason of the construction of such railway. In case of failure to make amicable settlement with any occupant, such compensation shall be determined by the appraisement of three disinterested referees to be appointed, one (who shall act as chairman) by the president, one by the chief of the nation to which said occupant belongs, and one by said railway company, who, before entering upon the duties of their appointment, shall take and subscribe, before a district judge, clerk of a district court, or United States commissioner, an oath that they will faithfully and impartially discharge the duties of their appointment, which oath, duly certified, shall be returned with their award, to, and filed with, the secretary of the interior within sixty days from the completion thereof, and a majority of said referees shall be competent to act in case of the absence of a member, after due notice. And upon the failure of either party to make such an appointment within thirty days after the appointment made by the president, the vacancy shall be filled by

the district judge of the court held at Fort Smith,
Arkansas, or by the district judge of the northern
district of Texas, upon the application of either party.
The chairman of said board shall appoint the time
and place for all hearings within the nation to which
said occupant belongs.    Each of said referees shall
receive for his services the sum of four dollars per
day, for each day they are engaged in the trial of any
case submitted to them under this act, with mileage
at five cents per mile.    Witnesses shall receive the
usual fees allowed by the courts of said nation. Costs,
including compensations of the referees, shall be
made a part of the award and be paid by such railroad
company.    In case the referees cannot agree, then
any two of them are authorized to make the award.
Either party being dissatisfied with the findings of
the referee, shall have the right, within ninety days
after making the award and notice of the same, to ap-
peal by original petition to the district court held at
Fort Smith, Arkansas, or the district court for the
northern district of Texas, which court shall have ju-
risdiction to hear and determine the subject matter of
said petition, according to the laws of the state in
which the same shall be heard for determining the dam-
age when property is taken for railroad purposes.    If,
upon the hearing of such appeal, the judgment of the
court shall be for a larger sum than the award of the
referees, the costs of said appeal shall be adjudged
against the railway company.    If the judgment of the
court shall be for the same sum as the award of the
referees, then the costs shall be adjudged against the
appellants.    If the judgment of the court shall be for
a smaller sum than awarded by the referees, then the
costs shall be adjudged against the party claiming
damages.    When proceedings have been commenced
in court, the railway company shall pay double the
amount of the award into the court, to abide the judg-
ment thereof, and then have the right to enter upon
the property sought to be condemned and proceed
with the construction of the railroad.

"SEC. 4. That said railway shall not charge the in-
habitants of said territory a greater rate of freight than
the rate authorized by the laws of the state of Arkan-
sas, or Texas, for service and transportation of the

same kind: *Provided*, that passenger rates on said rail-road shall not exceed three cents per mile.   Congress hereby reserves the right to regulate the charges for freight and passengers on said railway, and messages on said telegraph and telephone line, until a state government or governments shall exist in said terri-tory within the limits of which said railway, or a part thereof, shall be located, and then such state govern-ment or governments shall be authorized to fix and regulate the costs of transportation of persons and freight within their respective limits by said railway; but congress expressly reserves the right to fix and regulate, at all times, the cost of such transportation by said railway or said company whenever such trans-portation shall extend from one state into another, or shall extend into more than one state: *Provided*, how-ever, that the rate of such transportation of passen-gers, local or inter-state, shall not exceed the rate above expressed: *And provided further*, that said rail-way company shall carry the mail at such prices as congress may by law provide, and until such rate is fixed by law, the postmaster-general may fix the rate of compensation.

"SEC. 5.  That said railway company shall pay to the secretary of the interior, for the benefit of the partic-ular nations or tribes through whose lands the said railway may be located, the sum of fifty dollars in addition to compensation provided for in this act for property taken and damages done to individual occu-pants by the construction of the railway, for each mile of railway that it may construct in said terri-tory, said payments to be paid in installments of five hundred dollars as each ten miles of road is graded: *Provided*, that if the general council of either of the nations or tribes, through whose lands the said rail-way may be located, shall, within four months after the filing of maps of definite locations, as set forth in § 6 of this act, dissent from the allowance hereinbefore provided for, and shall certify the same to the secre-tary of the interior, then all compensation to be paid to such dissenting nation or tribe under the provisions of this act shall be determined as provided in § 3 for the determination of the compensation to be paid to the individual occupants of land, with the right of

appeal to the courts upon the same conditions and requirements as therein provided: *Provided further*, that the amount awarded or adjudged to be paid by said railway company for said dissenting nation or tribe shall be in lieu of the compensation that said nation or tribe would be entitled to receive under the foregoing provisions. Such company shall also pay, so long as said territory is owned and occupied by the Indians, to the secretary of the interior, the sum of fifteen dollars per annum for each mile of railway it shall construct in the said territory. The money paid to the secretary of the interior under the provisions of this act shall be apportioned by him in accordance with the laws and treaties now in force between the United States and said nations and tribes, according to the number of miles of railway that may be constructed by said railway company through their lands: *Provided*, that congress shall have the right to, so long as said lands are occupied and possessed by said nation and tribes, to impose such additional taxes upon said railroad as it may deem just and proper for their benefit, and any territory or state hereafter formed, through which said railroad shall have been established, may exercise the like power as to such part of said railway as may lie within its limits. Said railway company shall have the right to survey and locate its railway immmediately after the passage of this act.

"SEC. 6. That said company shall cause maps, showing the route of its located lines through said territory, to be filed in the office of the secretary of the interior, and also to be filed in the office of the principal chief of each of the nations or tribes through whose lands said railway may be located, and after the filing of said maps no claim for subsequent settlement and improvement upon the right of way shown by said maps shall be valid, as against the company: *Provided*, that when a map showing any portion of said railway company's located line is filed as herein provided for, said company shall commence grading said located line within six months thereafter, or such location shall be void; and said location shall be approved by the secretary of the interior, in sections of twenty-five miles before construction of any such section shall be begun.

"Sec. 7. That the officers, servants and employes of said company necessary to the construction and management of said road shall be allowed to reside, while so engaged, upon such right of way, but subject to the provisions of the Indian intercourse laws, and such rules and regulations as may be established by the secretary of the interior in accordance with said intercourse laws.

"Sec. 8. That the United States circuit courts for the Western district of Arkansas, and the Northern district of Texas, and such other courts as may be authorized by congress, shall have, without reference to the amount in controversy, concurrent jurisdiction over all controversies arising between said. Choctaw Coal and Railway company and the nations and tribes through whose territory the said railway shall be constructed. Said courts shall have like jurisdiction, without reference to the amount in controversy, over all controversies arising between the inhabitants of said nations or tribes and said railway company, and the civil jurisdiction of said courts is hereby extended within the limits of said Indian Territory, without distinction as to citizenship of parties, so far as may be necessary to carry out the provisions of this act.

"Sec. 9. That said railway company shall build at least one hundred miles of its railway in said territory within three years after the passage of this act, and complete the main line of the same within said territory within one year thereafter, or the rights herein granted shall be forfeited as to that portion not built; that said railway company shall construct and maintain continually all road and highway crossings and necessary bridges over said railway, wherever said roads and highways do now or may hereafter cross said railway's right of way. or may be by the proper authorities laid out across the same.

"Sec. 10. That the said Choctaw Coal and Railway company shall accept this right of way upon the express condition, binding itself, its successors and assigns, that they will neither aid, advise nor assist in any effort looking towards the changing or extinguishing the present tenure of the Indians in their lands, and will not attempt to secure from the Indians any

further grant of land, or its occupancy than is herein-before provided: *Provided*, That any violation of the condition mentioned in this section shall operate as a forfeiture of all the rights and privileges of said railway company under this act.

"SEC. 11. That all mortgages executed by said railway company conveying any portion of its said road, with its franchises, that may be constructed in said Indian Territory, shall be recorded in the department of the interior, and the record thereof shall be evidence and notice of their execution, and shall convey all rights and property of said company as therein expressed.

"SEC. 12. That congress may at any time amend, add to, alter, or repeal this act.

"SEC. 13. That the right of way herein and hereby granted shall not be assigned or transferred in any form whatever prior to the construction and completion of the road, except as to mortgages or other liens that may be given or secured thereon to aid in the construction thereof.

"Approved February 18, 1888."

The amendment to said act being "An Act to Amend Section One of an Act Entitled 'An Act to Authorize the Choctaw Coal and Railway Company to Construct and Operate a Railroad Through the Indian Territory, and for Other Purposes,'" approved February 13th, 1889, invests and empowers the Choctaw Coal and Railway company with the right of locating, constructing, owning, equipping, operating, etc., a line by the most feasible and practicable route through the Indian Territory, to the west boundary line of the state of Arkansas, and a branch line to intersect the Atchison, Topeka & Santa Fe railway at the most convenient point between Halifax station and Ear creek, otherwise known as the North Fork of the Canadian river.

The act approved August 24, 1894, being an act to authorize the purchasers of the property and fran-

chises of the Choctaw Coal and Railway company to organize a corporation and to confer upon the same all the powers, privileges and franchises vested in the company, reads as follows:

"An Act to Authorize Purchasers of the Property and Franchises of the Choctaw Coal and Railway Company to Organize a Corporation, and to Confer Upon the Same All the Powers, Privileges and Franchises Vested in the Company."

"Whereas, the Choctaw Coal and Railway Company, a corporation created under and by virtue of the laws of the state of Minnesota, and now doing business in the Indian Territory and Oklahoma Territory under and by virtue of certain acts of congress empowering it so to do, is insolvent, and in order to enable the creditors and stockholders of the same to reorganize said company in such a way as to secure the completion of the railroad authorized to be constructed by said company, a sale of its property and franchises is necessary."

The act thereupon proceeded to provide that the purchasers of the rights of way, railroads, and other property and the franchises of the Choctaw Coal and Railway company at any sale made under any process or decree of any court having jurisdiction thereof, shall be and are, hereby constituted a corporation and shall be vested with all the right, title, interest, property, etc., in and to such rights of way, railroads, and other property of the Choctaw Coal and Railway company, and with all the rights, powers, immunities, privileges and franchises which have been heretofore granted or conferred upon said company by any act of congress or which it possesses by virtue of its charter under the laws of the state of Minnesota. And then proceeded to provide that such new corporation should not have the right to acquire and hold any houses or buildings at South McAlester situated off the right of way and depot grounds of the Choctaw Coal and Railway company.

Section 2 of the act made certain provisions as to the time and method of organization required of the new corporation.

Section 3 provided that certificates of the organization of the new corporation and of the purchase of the property of the Choctaw Coal and Railway company should·be filed in the office of the secretary of the interior.

The remaining sections of the act made various provisions with reference to the perpetual succession, ability to sue and be sued, enactment of by-laws and regulations, and generally to do all and singular the matters and things which should be necessary or convenient to enable the said company to maintain, use and operate their railroads and mines which it may become possessed of by virtue thereof, in conformity with the provisions of the acts of congress relating to or affecting the Choctaw Coal and Railway company, and with reference to meetings of stockholders and officers, and annual elections, and the reservation of authority in congress to at any time amend, alter or repeal the act.

By an act of congress approved February 21, 1891, the provisions of the act of congress approved February 18, 1888, by which the Choctaw Coal and Railway company was authorized to build its railroad through the Indian Territory, were extended for the period of two years, until February 18, 1894; the time was again extended until February 18, 1896.

Further proceedings were had in the case as follows: After the filing of the answer, and upon the 19th day of April, 1895, the defendant filed its motion for the dissolution of the temporary injunction for the reasons that, (1) the petition did not state facts sufficient to constitute a cause of action, or to entitle the plaintiffs to an injunction, and that (2) the answer and affidavits of the defendants show that the defendant company has an absolute and legal right to

construct its railroad over the twenty-five mile sec-
tion in question, and the injunction should never have
been granted and should now be dissolved, and that
(3) the action is improperly brought in the name of
the United States, and because there is an adequate
remedy at law, and that (4) because no bond was given
by plaintiff.

A hearing having been had on the 23d day of April,
1895, the judge of the district court upon the 1st day
of May, 1895, delivered a careful, elaborate and able
opinion upon the case, and ordered and adjudged that
the temporary injunction be dissolved. The judgment
of the court is in the following terms :

"And afterwards, to-wit: April 23, 1895, at 9
o'clock, A. M. at chambers, at ' Oklahoma City, O. T.,
pursuant to notice given as required by the order
heretofore made,. said cause came on for hearing on
motion of defendants to dissolve the temporary in-
junction issued herein March 20, 1895, plaintiffs being
present by C. R. Brooks, attorney for the United
States of America, for the Territory of Oklahoma, and
Horace Speed, attorney for the relators, and defend-
ants by J. W. McLoud and John I. Dille; defendants
submitted their evidence to sustain said motion, and
plaintiffs their evidence resisting the same, both par-
ties having rested and the argument of counsel heard,
the case is taken under advisement.

"And afterwards, to-wit: May 1, 1895, at 7:30 P. M.
at chambers, at Oklahoma City, O. T., pursuant to
previous notice, all of the parties being present by
their said attorneys, and the judge being duly ad-
vised in the premises, finds that the route of the de-
fendant, the Choctaw, Oklahoma & Gulf Railroad com-
pany's located line over the country in controversy
and designated in the petition and answer as section
four, is the one selected by the said company after a
careful survey of the same, and is the most feasible
and practicable route over said section; 'that said
company prepared in due form a map of said definite
route of location and filed the same with the secretary
of the interior, on the — day of December, 1894, and

has complied with all the requirements of law to en-
title it to construct its railroad over said route; that
said section four is wholly within the Territory of
Oklahoma; that there are no lands held by individual
occupants according to the laws, customs and usages of
any Indian nation or tribe within said section four;
that so much of said § 6, of the act of congress
of February, 1888, as provides for the approval of the
location by the secretary of the interior relates
wholly to lands so·occupied, and that such approval
of the section of the route in question is unnecessary
and not required by law.

"It is, therefore, considered, ordered and adjudged
that said temporary injunction be, and the same is,
hereby dissolved, to which plaintiff excepts.

"Plaintiffs are allowed twenty days to prepare and
serve a case-made; defendants are allowed to suggest
amendments, and case-made to be settled on five days'
notice to be given by plaintiffs to defendants.

"Witness my hand this 1st day of May, A. D. 1895.
"HENRY W. SCOTT, Judge."

And ·thereafter, on the 23d day of May, 1895, a sec-
ond order was passed in the case in the district court
at Tecumseh, in Pottawatomie county, which, omit-
ting the venue and title of the cause, reads as follows:

"And now, to-wit, on this 23d day of May, A. D.
1895, it being one of the regular judicial days of the
May, 1895, term of the district court of the Third judi-
cial district, in and for Pottawatomie county, Okla-
homa Territory, this cause came on for final hearing
and determination, and the court, after being fully
advised in the premises, and after considering said
cause, finds that the order of the judge of the district
court of the Third judicial district, dissolving a tem-
porary injunction, on the first day of May, 1895, at
chambers in Oklahoma City, Oklahoma Territory, and
all orders heretofore made, are hereby set aside, and
held for naught, and it is now ordered, adjudged and
decreed that upon the pleadings, proofs and findings by
the judge of this court, of law and fact heretofore, which,
with the opinion of the judge, is ordered made a part of
this record, that this action be, and the same is, hereby

dismissed, it being especially intended that the temporary injunction heretofore issued be dissolved and set aside, and that this proceeding be dismissed with costs; to all of which plaintiffs except, which exception is allowed by the court, and the plaintiffs pray that a new trial be granted, and the court, after being fully advised in the premises, overruled said motion; which motion is in words and figures following, towit:

"*United States of America v. The Choctaw, Oklahoma & Gulf R. R. Co. et al.*

"The plaintiff moves the court for a new trial in the above entitled cause, and for cause of new trial says that the decision is not sustained by sufficient evidence; that the decision is contrary to law.

"(Signed)                    HORACE SPEED,
              "Of Counsel for Plaintiff."

"To which action of the court the plaintiffs except, which exception is allowed by the court.

"Plaintiffs thereupon prayed an appeal to the supreme court of Oklahoma Territory, which was allowed by the court, and ten days is hereby allowed said plaintiffs to make and serve a case-made upon defendants. Five days are allowed for the suggestion of amendments, and case-made to be settled five days after service of said case-made, or ten days to appeal said cause upon a transcript of the record of said cause, said record to be duly signed, settled and certified as required by law.

"Done at Tecumseh, Pottawatomie county, O. T., this 23d day of May, A. D., 1895.

                    "H. W. SCOTT, Judge."

Thereafter, upon the 25th day of May, a motion was filed in the case by the defendants to set aside the order of May 23, passed by the district court, and for a new trial for the following reasons:

1. Because, heretofore, on the 1st day of May, 1895, the judge of the Third judicial district, at chambers, at Oklahoma City, Oklahoma Territory, made an order dissolving a temporary injunction theretofore issued in said cause, which order was final and an

appealable order, and thereupon at the request of the plaintiffs, the judge of said court made an order allowing plaintiffs twenty days within which to prepare and serve a case-made, which time expired on the 21st day of May, 1895; that plaintiffs within said time failed to prepare and serve a case-made upon the defendants, and thereupon said order dissolving said injunction became a final judgment of this court which could not be appealed from, and was a final adjudication of the plaintiff's action for the injunction herein, and the court was without jurisdiction to make the order of May 23, 1895, above referred to, and said order was contrary to law and void.

2. Because there was no trial of the cause on the 23d day of May, 1895, and no evidence whatever offered, and the defendants were not present and were not represented by counsel and had no notice whatever that said order would be applied for and would be granted, and no one was present except the counsel for the relators herein, and said order was either entered by the court upon its own motion, or upon the suggestion of counsel for the relators.

3. Because of the happening of certain events and the going into effect of certain laws, that is, the law opening the Kickapoo country to white settlement, and the opening to white settlement of the same since the making of the order herein on May 1, 1895, as to which defendants desire to file a supplemental answer and hereby ask leave of the court to file the same.

This motion of the defendants was submitted to the court upon the same day, and the following order was made therein:

"And now, on this 25th day of May, 1895, come the defendants and file a motion, supported by affidavit, to set aside the order herein of May 23, 1895, which

motion is by the court overruled, to which defendants except and such exceptions are allowed.

"It is further ordered by the court that the supplemental answer of the defendants tendered herein be allowed to be filed of this date, and the same is hereby ordered to be made a part of the record in this case.
"(Signed.)                    H. W. SCOTT, Judge."

Thereupon the defendants filed their supplemental answer, which bore endorsement as follows:

"Leave granted to file as of May 23, 1895, and prior to judgment of said date, this 27th day of May, 1895.
"(Signed.)                    H. W. SCOTT, Judge."

The supplemental answer set forth, that since the filing of the petition and answer herein and motion to dissolve the injunction, and since the order of May 1, 1895. dissolving the injunction, the country or tract of lands described in plaintiff's petition as the Kickapoo Indian reservation have been opened to homestead settlement by proclamation of the president. A copy of which proclamation is attached, and made a part thereof, and said country, in pursuance of said proclamation, was opened on the 23d day of May, 1895, and thereupon ceased to be in any sense an Indian reservation, or a reservation of any kind. And further showed that since the proceedings heretofore had in this case, the territorial authorities of Oklahoma Territory, consisting of the governor, secretary and auditor of said territory, composing the board of railway assessors for said territory, have recognized defendant's right to the right of way over the twenty-five miles in controversy by assessing the said right of way and said company's grade thereon for taxation for the year 1895.

The supplemental answer was verified upon belief by J. W. McLoud, attorney for the defendants.

In bringing the case to this court by petition in error, the plaintiffs make assignments of errors as follows: That (1) the court erred in overruling the mo-

tion for a new trial and in rendering judgment dismissing the action, and (2) in holding that the approval of the location of railroad required by the acts of congress, as set out in the complaint, was merely a ministerial act, not involving the judgment or discretion on the part of the secretary of the interior, and that if such acts on the part of the secretary of the interior were unnecessary or merely ministerial, the location could be made in 1894 different from the location in 1890, as indicated by the ruling of the secretary of the interior, and (3) in holding that the defendant company could locate its line of railroad through lands allotted to Indians in Pottawatomie county, indicated and described in the bill of complaint, and begin the construction of its road upon that line without having the approval of the secretary of the interior, and (4) holding that the Kickapoo Indian reservation was not, at the time the complaint was filed, and the judgment of the court was rendered, Indian country, and that over such reservation and through the counties of Oklahoma and Pottawatomie in said territory, and over and across public roads and highways in said counties, that the defendant had a right to construct its line without first having a map of location of said line of railroad approved by the secretary of the interior, and (5) that the defendant could locate its line of railroad as located on section four and over the land through which it is located in section four under the General Laws of the Territory of Oklahoma, and need not locate its line according to the provisions of the acts of congress specially authorizing the construction of such railroad, setting out the manner in which and the conditions under which such line should be located and constructed; and in holding that § 6 of the act of February 18, 1888, did not apply to approving of the map of the location of the right of way of defendant railroad company at the time its map of

location was filed in December, 1894, as aforesaid, and (6) in holding that the act of congress of 1875 granted to railroad corporations the right to construct lines of railroad across the public lands without reference to special legislation, and that such acts governed the mode by which the defendant railroad should acquire its right of way, instead of the special acts providing the method by which said defendant railroad and its predecessor should acquire such rights of way, and (7) in holding that the provisions of the act of congress granting the rights of way to the Choctaw Coal and Railway company and the defendant company were grants of such rights of way *in praesenti*, so as to cut out and exclude the rights of the Indians and others who, after the dates of such acts of congress, were allotted lands or took homesteads over which the line of said railroad company was thereafter located, and (8) in refusing to grant the permanent injunction as prayed in the bill of complaint, and in rendering a final decree upon the findings and conclusions indicated and set out in the order of May 23, 1895.

*Richard Olney, Attorney-General of the United States, C. R. Brooks, United States Attorney,* and *Horace Speed,* for plaintiff in error.

*J. W. McLoud* and *John I. Dille,* for defendants in error.

### OPINION OF THE COURT.

The opinion of the court was delivered by

McATEE, J.:    Various motions were filed by the defendant company in this court in this case, after the filing of the petition in error and transcript of record here, upon June 6, 1895.    Under the direction of the court, these motions were argued orally, and upon printed briefs in connection with the argument upon

the merits of the case as presented in the transcript of the record, and will be here reviewed.

The defendant railroad company filed its motion on June 24, 1895, in this court, to require the plaintiffs to make a deposit and give security for costs. This motion was based upon rule second of the Rules of Practice of the supreme court of the Territory of Oklahoma, which reads as follows:

"No cause shall be docketed, nor process issued thereon (except in cases wherein the territory or the United States is appellant) until the plaintiff in error or appellant shall pay to the clerk ten dollars advance fees; nor shall any civil cause be docketed until security for costs shall be given, approved by the clerk of the supreme court, conditioned for the payment of all costs for which the plaintiff in error may be liable."

The argument admits that in this case no security for costs has been given, as provided by the rule. It is, however, contended by the plaintiff in error that compliance with the rule is not necessary, since this is a suit by the United States, and that the United States is not required to pay costs, or to give the security here required, in order to avail itself of the rights and remedies provided by and within the jurisdiction of this court.

This contention the plaintiff maintains upon the following sections of the Revised Statutes of the United States, which are a part of the judiciary act passed by congress in 1798, which read as follows :

"SEC. 1000. *Bond in Error and on Appeal.* Every justice or judge signing a citation on any writ of error shall, except in cases brought up by the United States or by direction of any department of the government, take good and sufficient security that the plaintiff in error or the appellant shall prosecute his writ or appeal to effect, and if he fail to make his plea good, shall answer all damages and costs, where the writ is a *supersedeas* and stays execution, or all costs only where it is not a *supersedeas* as aforesaid.

"SEC. 1001. *No Bond Required of United States.* Whenever a writ of error, appeal, or other process in law, admiralty, or equity, issues from or is brought up to the supreme court, or circuit court, either by the United States or by direction of any department of the government, no bond, obligation, or security shall be required from the United States, or from any party acting under the direction aforesaid, either to prosecute said suit, or to answer in damages or costs. In case of an adverse decision, such costs as by law are taxable against the United States, or against the party acting by direction as aforesaid, shall be paid out of the contingent fund of the department under whose directions the proceedings were instituted."

The sections here recited are a part of the procedure provided by congress for the supreme court and circuit and district courts of the United States, which are provided for under art. 3, § 1, of the constitution of the United States, as follows:

"SEC. 1. *Supreme and Inferior Courts.* The judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish. The judges both of the supreme court and inferior courts, shall hold their offices during good behavior."

In providing a mode of procedure for the "judicial power of the United States, * * * vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish," congress did not provide a code of procedure for the territorial courts. The legislation here stated, does not relate to the territorial courts. So far as congress has legislated with regard to territorial courts, it has legislated under the general powers which congress possesses over, and to provide a government for, the territories, and not under the constitutional authority given to it to ordain and establish one surpreme court and inferior courts vested with judicial power, for the United States. (*Amer. Ins. Co.*

*v. Canter*, 1 Peters, 511; *Stacy v. Abbott*, 1 Am. L. T. 84; *Benner v. Porter*, 9 How. Pr. 244.)

The same conclusion must be drawn from an examination of the context of the sections relied upon. Section 1000 provides that the judge shall take good and sufficient security, except in cases brought up by the United States or by direction of any department of the government, and in § 1001, next ensuing, it is provided in what cases such security shall not be required, that is, in "issues * * * brought up to the supreme court, or a circuit court, either by the United States or by direction of any department of the government, no bond, obligation, or security shall be required from the United States, or from any party acting under the direction aforesaid," etc.

The prohibition against requiring security from the United States, or from any party acting under the direction aforesaid, is in cases brought up to the supreme court of the United States, or circuit court of the United States. The prohibition is not against bringing up the case by petition in error from the district court of a territory, to the supreme court of a territory. And while the Organic Act of this territory provides that its district court "shall have and exercise exclusive of any court heretofore established, the same jurisdiction in all cases arising under the constitution and laws of the United States as is vested in the circuit and district courts of the United States," the writ of error here is not to the supreme court of the United States, or to a circuit court of the United States, but to the supreme court of the Territory of Oklahoma. It cannot be contended that these sections are imported into the practice of this territory.

"Laws regulating the proceedings of the United States courts are of specific application, and are, in truth and in fact, locally inapplicable to the courts of a territory. * * * The acts of congress respecting

proceedings in the United States courts, are con-
cerned with, and confined to, those courts, considered
as parts of the federal system, and as invested with
the judicial power of the United States expressly con-
ferred by the constitution.   *   *   *   They were not
intended as exertions of that plenary municipal
authority which congress has over the district of
Columbia and the territories of the United States.
They do not contain a word to indicate any such
intent.   The fact that they require the circuit and
district courts to follow the practice of the respective
state courts in cases at law, and that they supply no
other rule in such cases, shows that they cannot apply
to the territorial courts.   As before stated, these acts
have specific application to the courts of the United
States, which are courts of a peculiar character and
jurisdiction.   *   *   *   As a general thing, subject to
the general scheme of local government chalked out
by the Organic Act, and such special provisions as
are contained therein, the local legislature has been
intrusted with the enactment of the entire system of
municipal law, subject, also, however, to the right of
congress to revise, alter and revoke at its discretion.
*   *   *   From a review of the entire past legislation
of congress of the subject under consideration, our
conclusion is that the practice, pleadings and forms
and modes of proceeding of the territorial courts, as
well as their respective jurisdictions, subject, as
before said, to a few express or implied conditions in
the Organic Act itself, were intended to be left to the
legislative action of the territorial assemblies, and to
the regulations which might be adopted by the courts
themselves."   (*Hornbuckle et al. v. Toombs*, 18 Wall.
648-657.

There is in force in the Territory of Oklahoma, and
relating to appeals on writs of error from a district
court of the Territory to this court, no provision
under which the United States is exempted from the
rule of procedure of this court, under which it is pro-
vided that

"No civil cause shall be docketed until security for
costs shall be given," etc.

We understand the rule to be that unless such special

exemption is provided for, if the United States comes voluntarily into the court, it must do so under similar circumstances and upon the same conditions as if it were a private party, unless, indeed, exemption should be conceded to it upon the ground of sovereignty. ( *The United States v. Thompson*, 93 U. S. 588; *The United States v. Union Pac. R. R. Co.* 105 U. S. 263.)

And such exemption is not relied upon in this case, since the liability here discussed, has been provided against by the requirement made in behalf of the United States, and taken by those who represent the interest of the United States, if it has any in the case, by the agreement filed with the bill of complaint, that the relators should be responsible to the United States for its costs incurred therein.

The case of *The United States v. Bryant*, 111 U. S. 500, has been cited to support the contention of plaintiff that §§ 1000 and 1001 relate, and are applicable, to writs of error from the district courts of this territory to the supreme court of this territory. The case does not support the contention. This was an action at law by the United States in the circuit court of the United States for the southern district of Alabama, and cannot aid us in reference to the application of those sections to proceedings in the territorial courts.

If the United States should, in fact, itself, be exempt from the application of the rule of court requiring security for costs, we should yet hold that the relators are themselves the real parties in interest, and that, as such, they would not be entitled to the benefit of the exemption thus provided in behalf of the United States. They being thus the real parties in interest and having invoked the name and authority of the United States in the bringing of this action, would not be permitted to prosecute it for their own benefit without complying with the rule.

In the absence of any special provision this action

must be prosecuted in the name of the real party in interest, and if these parties are here with any legal rights, it is by reason of being here in that capacity. (Chapter 26, § 6, Code of Civil Procedure, Statutes of Oklahoma, 767; *State of Kansas ex rel. A. T. & S. F. R. R. Co. v. County Commissioners*, 11 Kan, p. 66; *Nixon v. School District*, 32 Kan, 511; *A. T. & S. F. R. R. Co. v. State*, 22 Kan. 17.)

The view here taken was undoubtedly that of the department of justice in charge of these proceedings, and has been provided against herein, since there was filed in the district court on March 19, 1895, in conjunction with and annexed to the bill of complaint, an agreement and obligation to the United States, which recites that:

"William S. Search, Samuel Clay, Wright Christian, George A. Outcelt and Edward J. Kelley hereby agree that their names shall be used as relators in the above entitled cause and that they will be responsible to the United States for its costs incurred therein."

We hold that the defendants in this action are entitled to an order requiring the plaintiff herein to give security for costs, to be approved by the clerk of the supreme court, conditioned for the payment of all costs for which the plaintiffs in error may be liable, before they could require any further proceeding or demand relief herein.

Upon June 24, 1895, the defendant also filed its motion in the cause to strike from the transcript filed in the cause, the affidavits of Dunn, Webster and others, together with certificates, letters, map and opinion of Judge Henry W. Scott, for the reason that "none of the same were made a part of the record in this case by a bill of exceptions or case-made, and therefore are no part of the record and were improperly filed with said transcript," and also moved the court to tax the costs of making the portions of the

transcript above referred to, to the plaintiffs herein, for the reason that the same were improperly filed with the transcript in this court.

Two methods are provided by the statutes of this territory, either of which may be adopted in bringing appeals to this court from the district courts, in all civil causes: (1) by a transcript of the record, and (2) by case-made. The Code of Civil Procedure, ch. 66, p. 855-856, of the Statutes of Oklahoma, 1893, provides, with reference to the second method of taking an appeal from the district court, that :

"SEC. 564. In all actions hereafter instituted by petition in error in the supreme court, the plaintiff in error shall attach to and file with the petition in error the original case-made, filed in the court below, or a certified transcript of the record of said court.

"SEC. 565. A party desiring to have any judgment or order of the district court, or a judge thereof, reversed by the supreme court, may make a case-made, containing a statement of so much of the proceedings and evidence, or other matters in the action, as may be necessary to present the errors complained of to the supreme court.

"SEC. 566. The case so made, or a copy thereof, shall, within three days after the judgment or order is entered, be served upon the opposite party or his attorney, who may within three days thereafter suggest amendments thereto in writing, and present the same to the party making the case, or to his attorney. The case, and amendments shall be submitted to the judge, who shall settle and sign the same, and cause it to be attested by the clerk, and the seal of the court to be thereto attached. * * *

"SEC. 567. The court or judge may, upon good cause shown, extend the time for making a case-made and the time within which the case-made may be served; and may also direct notice to be given of the time when the case may be presented for settlement after the same has been made and served, certified and signed by the judge who tried the cause."

The final judgment or order was made by the judge

of the district court at chambers, on the 1st day of May, 1895, by which it was ordered that "the temporary injunction be, and the same is, hereby dissolved, to which plaintiff excepts." By this order the plaintiffs were allowed twenty days to prepare and serve a case-made. Thereafter, on the 23d day of May, 1895, "it being one of the regular judicial days of the May term of the district court," the court finds that the "order of the judge of the district court of the Third judicial district, dissolving the temporary injunction, on the 1st day of May, 1895, at chambers in Oklahoma City, Oklahoma Territory, and all orders heretofore made, are hereby set aside and held for naught." And the court then proceeded especially to dissolve and set aside the order of May 1, 1895, to all of which the plaintiff excepted.

The plaintiff thereupon made a motion for a new trial, upon the following grounds: (1) That the "decision is not sustained by sufficient evidence," and, (2) that the "decision is contrary to law," which was overruled, to which the plaintiff excepted. Upon which the plaintiff prayed an appeal, and the order of the court, then passed, provided that "ten days is hereby allowed said plaintiffs to make and serve a case-made upon the defendants."

The first judgment, entered May 1, 1895, and the second judgment, dated May 23, 1895, are, in all essential respects, identical, except that the first judgment includes no statement of a motion for a new trial, with ruling and exception, and with the further exception that in entering the second judgment the court undertook to allow an appeal to the supreme court and, also, allow from that date "ten days to make and prepare a case upon the defendants."

It is provided by the Code of Civil Procedure, § 320, p. 814, Statutes of Oklahoma, that

"The application for a new trial must be made at

the term the verdict, report or decision is rendered; and, except for the cause of newly discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial, shall be within three days after the verdict or decision was rendered, unless unavoidably prevented."

The decision rendered May 1 was, in all respects, final. The decision rendered May 23, 1895, was, as to the material thing ordered and accomplished by the judgment—that is, the dissolution of the temporary injunction—in no respect more effective in its terms than that which had been passed by the court on May 1.

This was an injunction proceeding, properly heard at chambers, and the fact that the first judgment was entered at chambers, made it in no respect invalid or ineffective. The fact that the second judgment was entered upon a "judicial day" and by the court, had no virtue, nor could it make a judgment dismissing the temporary injunction, in any respect more final or conclusive. There could have been no reason why the court should have undertaken to set aside, by the judgment entered May 23, the final judgment which had been entered on May 1, in the same matter, except a strong desire to oblige the plaintiffs in error, by enabling them to make their motion for a new trial within the time prescribed by the statute, if possible, and for the purpose of extending the time in their behalf, within which to prepare and serve a case-made for the supreme court, or "ten days to appeal said cause upon the transcript of the record in said cause."

Our Code of Civil Procedure has been adopted from the state of Kansas, and this court uniformly follows the principles of interpretation and construction which have been applied to it by the supreme court of that state. It has been by that court repeatedly held, with reference to the motion for a new trial, that a

motion must be filed in strict conformity with the provisions of the statute, *i. e.*, within "three days after the verdict  *  *  *  was rendered, unless unavoidably prevented." (*Mercer v. Ringer*, 40 Kan. 191; *Bubb v. Cain*, 37 Kan. 692; *McDonald v. Weeks*, 32 Kan. 58.)

And that when no showing has been made that the party has been unavoidably prevented from filing his motion within the time specified, the court cannot consider or review the errors occurring upon the trial. (*Odell v. Sargent*, 3 Kan. 80; *Mitchell v. Milhoan*, 11 Kan. 617; *Nesbitt v. Hines*, 17 Kan. 316; *Dyal et al. v. City of Topeka*, 35 Kan. 62.)

And it has been by the same court uniformly held that the district judge has no power to extend the time for making a case, after the time fixed by the statute and by the order of the court has once elapsed. (*The Ætna Life Insurance Co. v. Koons*, 26 Kan. 215; *Dyal v. City of Topeka*. 35 Kan. 62; *Dodd v. Abram*, 27 Kan. 69.) ·

When, therefore, the court, in its final judgment in this case, of May 1, 1895, which was final as to the only matter involved, to-wit: the revocation of the temporary injunction, extending the time upon the application of plaintiffs for twenty days to make a case-made, and when the time so extended had expired upon the 21st day of May, the district judge had no power to extend the time for making a case. The power did not exist in him in any form. He was without authority. He could not extend the time by an order intended simply for that purpose, nor could he do so by any method less simple and direct. Not having jurisdiction to extend the time directly, he could not do so by indirection, and hence, the order extending the time for making a case-made after the time had expired within which the case was to be made under the order of May 1, was void, notwithstanding the fact that it was attempted to be accomplished through the instrumentality of revoking the judgment of May 1,

upon the temporary injunction, and renewing the order for extension of time by the new order dated May 23, 1895, and purporting to be a final judgment, which assumed to be the only order by which the temporary injunction was then, for the first time, revoked.

The second decision of May 23, purporting to be a final judgment, can have no effect to extend the time specified in the statute for the benefit of the plaintiffs in error, nor have any other effect, except as a substantial testimonial of the willingness of the district judge to strain the limits of his jurisdiction in an effort to relieve the plaintiffs in error and to aid them in appealing to this court for review.

The large number of affidavits, certificates, letters and the map which are furnished and annexed to the petition in error are certified to by the clerk of the district court of the Third judicial district as "a true, full and complete copy of the proceedings and papers in the case of *The United States of America v. The Choctaw, Oklahoma. & Gulf Railroad company and George S. Goode & Co.* a co-partnership, defendants, as the same remain on file in my office."

Together with other evidence of its insufficiency as a case-made, it has not "been submitted to the judge, who shall settle and sign the same." The evidence consisting of affidavits and papers purporting to have been used as evidence at the hearing below, are not, therefore, in such form as that they can be reviewed by this court.

We understand the statute prescribing the method of making up an original case-made and providing for its certification by §§ 564, 565, 566 and 567, of the Code of Civil Procedure above referred to, constitute the only and exclusive method by which evidence may be brought into this court in such form as that it may be reviewed and examined upon error. This is the case,

unless, indeed, it should appear upon examination that, as is claimed by the plaintiffs in error, "the decree adopts the opinion and expressly makes it a part of the record, and the proofs are also made a part of the record; that the findings are all in the opinion," and that this order of the court, making the opinion and proofs referred to therein, parts of the record, was sufficient for that purpose.

It is, by the decree of the district court dated May 1, 1895, stated that the "defendants submitted their evidence to sustain said motion, and plaintiffs their evidence to resist the same, and both parties having rested," and by the subsequent order dated May 23, it is "ordered, adjudged and decreed that upon the pleadings, proofs and findings by the judge of this court, of law and fact heretofore had, with the opinion of the judge, is ordered made a part of this record."

We hold that the decree of May 23, 1895, is void as to either of these purposes sought to be accomplished by it, by which a motion for a new trial can be made, or the evidence from the trial in the lower court be brought here for the review of errors, in lieu of the method prescribed by the specific and exclusive provisions which are made by the statute for the bringing of evidence into this court by a case-made, by which "hereafter in all actions instituted in the supreme court the original case-made shall be attached to the petition in error," and that such case-made shall be "served upon the opposite party or his attorney for the suggestion of amendments," and that the case so made shall then "be presented for settlement to the judge who shall settle and sign the same and cause it to be attested by the clerk," etc.

In support of their proposition, however, we are referred by the plaintiffs in error to § 192 Elliott's App. Proc., to *McCullah v. Allen*, 10 Kan. 121, to *Stapleton v. Orr*, 43 Kan. 170, to 14 How. Pr. 426, to

*Weyman v. Bank*, 59 How. Pr. 2, to *Auld v. Smith*, 23 Kan. 42, to *Smith v. Auld*, 31 Kan. 266, to *Mitchell v. Insley*, 33 Kan. 658, to *Redden v. Metzger*, 46 Kan. 288, and to *Mason Lumber Co. v. Beetchel*, 101 U. S. 68.

To review these authorities: It is stated in Elliott's App. Proc. § 192, that:

"The statute requires an order of the court in the nature of a special order, and without such an order, instruments of evidence, instructions, or the like, cannot be regarded as in the record unless, of course, brought in by a bill of exceptions."

The reference here made is to the statute of the state of Indiana, which provides that,

"The transcript of motions, affidavits, and other papers,  *  *  *  depositions, and papers filed as mere evidence, shall not be certified, unless made a part of the record by exception or order of court."

We do not practice under such a statute. Our statute provides, Code of Civil Procedure, §§ 430, 431, as follows:

"The record shall be made up from the petition, the process, return, the pleadings subsequent thereto, reports, verdicts, orders, judgments, and all material acts and proceedings of the court.  *  *  *  Evidence must not be recorded."

But it is urged by the plaintiff upon the authority of the Kansas cases that the opinion contained findings of fact and conclusions of law, and "by order of the court all are made a part of the record." We do not find that this conclusion can be drawn from the authorities cited from that state.

Our Code of Civil Procedure, adopted from Kansas, provides, § 302, Statutes of 1893, p. 812, that :

"Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its findings, except generally, for the plaintiff or defendant, unless one of the parties request it, with the view of excepting to the decision of the court upon the ques-

tions of law involved in the trial; in which case the
court shall state, in writing, the conclusions of fact
found, separately from the conclusions of law."

It will be here seen, (1) that in the absence of an ex-
press request by one of the parties to the cause, it is
not made the duty of the "court to state its findings,
except generally," and (2) that if one of the parties,
with a view of excepting to the decision of the court
upon the questions of law involved in the trial, re-
quest it, it shall then become the duty of the court to
state, in writing, the conclusions of fact found, sepa-
rately from the conclusions of law.   If the court, not
being requested and not having in view the taking of
exceptions to its decisions upon the questions of law
involved in the trial, does yet volunteer to prepare a
written opinion, including a recitation of the facts, or
a part of them in so far as it sees fit to do so, it is yet
acting under that provision of the statute which only
makes it its duty to find no further, or otherwise, than
"generally for the plaintiff, or for the defendant."
The voluntary statement of its opinion in writing
thus made, including such facts as it would see fit to
include in its opinion, is not such special finding of
fact and conclusion of law as is provided for by the
statute, when either party to the cause so requests it,
and such voluntry action of the court has been uni-
versally treated as a general finding only, notwith-
standing any care which it may have taken in the
preparation of a written opinion.   Such general find-
ing, under the voluntary action of the court, is radi-
cally different from the special findings of fact and
conclusions of law provided for under the second
branch of the statute.   Such special findings of fact
and separate conclusions of law, when made by the
court upon the request of either party and entered
upon the journal, although not signed by the judge
nor made a part of the record by a bill of exceptions,

have yet been held to be a part of the record by the supreme court in the state of Kansas in *McCullagh v. Allen*, 10 Kan. 121. Nor do the other Kansas cases go further.

It is urged by the plaintiff that in the case of *Stapleton v. Orr*, 43 Kan. 170, "the evidence in the case is attached to the opinion and referred to in the opinion as a part of it. Thereby the evidence becomes a part of the record."

The fact in this case, as extracted from the opinion of the court, was, that upon the motion to dissolve the attachment, "we could not, we think," examine the testimony submitted before the district court, and "do so in order to determine whether or not the order of dissolution was correct, but as the defendant has made it a part of his answer, we certainly can treat it as a part of the pleadings in this case."

It will thus be seen that the evidence was not attached to the opinion and referred to in the opinion as a part of it. The case does not aid us.

The case of *Mason Lumber Company v. Beechtel.* 101 U. S. 68, cited by the plaintiff in support of the proposition that "the findings of a referee upon which the judgment was rendered, like the verdict of a jury, constitutes an essential part of the record of the case."

We find, upon an examination of the case, that exceptions were taken to the report and overruled by the court below. That case, therefore, came regularly into the supreme court by a bill of exceptions, as we must infer from this statement in the opinion of the court, and the case does not support the statement of plaintiff's brief that the referee's report would form part of the record without such exceptions.

The New York practice, pressed upon our attention in the brief of plaintiffs, in the case of *Thomas v. Fauer*, 14 How. Pr. 426, and *Weyman v. Bank*, 59 How. Pr. 2,

does not support their contention. It is, in the syllabus of the former case, declared that, "the decision, which, by the 267th section of the Code, is required to be given in writing and filed by the clerk, is a very different thing from the opinion which the judge may think proper to write. The decision can only appear by his signature or allocutor. The opinion never should be carried bodily into the record."

On the contrary, in the absence of such a statutory provision as that found in the state of Indiana, it has been repeatedly held that no evidence, depositions, affidavits, judge's minutes, notes or opinions are a part of the record until they are embodied in a bill of exceptions or case-made, and that neither the action of the clerk by his certificate, nor the power of the judge himself, unless authorized by statute, can be effective to incorporate these matters in the record in any other manner than that which they are limited to, as prescribed by the legislative will. The provisions of the statute, as above set out, are made for the protection of the defendants in error. He has a right to avail himself of them, and the courts have no power to deprive him of the benefit of those provisions, if that is demanded. (*Haraszthy v. Horton*, 24 Cal. 545; *Thorne v. Hammond*, 46 Cal. 530; *St. A. Mill Co. v. Vandall*, 1 Minn. 250; *Balt. & Pot. R. R. Co. v. Trustees*, 1 Otto. 130; *Saint Croix Lumber Co. v. Pennington*, 2 Dak. 467; *Backus v. Clark*, 1 Kan. 303.)

The finding of a court, no matter how full and exhaustive or how complete and adequate may appear to be its statement of facts, unless it appears by the record that it was made upon the request of one or both of the parties as a special finding of fact and conclusion of law, will be but a general finding, and not a part of the record unless made so by a bill of exceptions. (*Connor et al. v. Town of Marion*, 112 Ind. 517.)

In an additional brief upon this motion filed by the

plaintiffs July 26, 1895, the cases of *Tolman v. S. B. & N. Y. R. R. Co.* 92 N. Y. 353, and *Snyder v. Snyder*, 96 N. Y. 92, are cited as supporting the proposition that the order of the court making the opinion and proofs referred to therein, parts of the record, and effectual in bringing the evidence here to review.

The case of *Tolman v. S. B. & N. Y. R. R. Co.*, was an appeal from an order of the general term, affirming an order of the special term, denying a motion to compel the plaintiff to file security for costs. The only question in the case was whether the lower court could "exercise its discretion in requiring security for costs." The question was jurisdictional. The court declared that it "did not possess the power," and filed its decision in making the order. There was no evidence in the record. It was simply a proposition of law, and the court of appeals looked into the decision in order to ascertain upon what grounds the lower court declared "its want of power to grant the application." It concluded upon a comparison of sections of the New York statute, cited in the decision of the lower court, that "the opinion constitutes an important and material part of the record, and is expressly referred to in the orders," declaring at the same time as a general proposition that "while the opinion can not ordinarily be referred to, to show the ground upon which an order is made, this case is not brought within any such rule. The reason for the rule is, it forms no part of the record, and therefore cannot be referred to to explain the meaning of the record."

Upon the authority of this case, the court again declared in *Snyder v. Snyder*, 96 N. Y. 92, that "notwithstanding the general rule that an appellate court is not to look beyond the order to ascertain the ground of judgment, it may do so when the terms of the order are ambiguous, or when the order itself refers to the opinion."

The opinion does not cite any statute upon the sub-

ject, nor show what the statute of the state of New York provides shall be the contents of the record brought to the court of appeals; nor in what manner the contents of such record shall be certified, as we have seen has been fully and carefully provided for by our own statute, and the interpretations made thereupon by the courts of that state from which our code was adopted. The rule which now seems to be accepted in New York upon the strength of the case of *Tolman v. S. B. & N. Y. R. R. Co.*, is not the rule here. And these authorities do not support the proposition that evidence can be imported into the record by an order of the court or of the judge. Such a holding would render nugatory the provisions of the statute for making up the record, and substitute for them the choice of the judge when, in ruling upon an appealable matter, he might see fit to exercise his discretion, or indulge his caprice.

The case of *In re Assignment of Holbrook*, 99 N. Y. 543-4, also cited, furnishes nothing further upon the matter.

We must, therefore, hold that the opinion of the court, including such statements of fact as may be contained therein, is not a part of the record by the order of the judge, that he is not authorized by the statute of this territory to make such an order, and that the order so made in the decree of May 23, 1895, would have had no such force or effect if the decree passed May 1, 1895, had not been final as to the dissolution of the temporary injunction, which was the only matter then to be determined, and exhausted the jurisdiction of the court in that matter.

The motion to strike from the transcript filed in the case, the affidavits of Dunn, Webster and others, together with certificates, letters, map and opinion of the judge of the district court, etc., as described in the motion, for the reason that "none of them were made

a part of the record in this case by a bill of exceptions or case-made and are therefore no part of the record, and were improperly filed with the said transcript," and "to tax the costs of making the portions of the transcript above referred to, to the plaintiffs for the reason that they were improperly made and filed with the transcript in this court," will be sustained.

It has also been moved by the defendant in error that the court affirm the judgment of the court below without consideration of the merits of this action for the following reasons : (1), for the reason that the decision of the court below was based upon evidence which has not been made a part of the record by case-made, or bill of exceptions, and is not before this court for review, and that no other questions are presented by the record for the consideration of this court.

This motion presents the question, whether, evidence having been produced at the hearing below, and the judgment of the court having been rendered thereupon, and the evidence not having been brought here by a case-made, this court can go into an examination as to whether the trial judge erred in rendering the judgment which he did.

It has been uniformly held by the supreme court of the state of Kansas, that:

"In order to have the question, whether the evidence supports the findings and judgment examined, a case-made should show that it contains all the evidence." (*Hill v. National Bank*, 42 Kan. 364.)

And it has been uniformly held by this court, in the the case of *W. A. Wood Co. v. Farnham*, 1 Okla. 375, Burford, J.:

"Unless the bill of exceptions is shown on its face to contain all the evidence, this court will not review the action of the court below in overruling a motion for a new trial because the verdict is not sustained by the evidence." (*L. N. A. & C. Ry. Co. v. Henley*, 88 Ind.

535; *L. N. A. & C. Ry. Co. v. Murdock*, 82 Ind. 381; *Swift v. Stein*, 13 Pac. Rep. 904; *Forelander v. Hicks, Administrator*, 6 Ind. 450.)

Notwithstanding the fact, therefore, that a large number of affidavits are annexed to the transcript which has been brought here, they will not be examined or reviewed by this court. No means are furnished to us by which the correctness of the determination upon the facts by the district judge can be examined into, and under such circumstances the practice has been necessary and uniform, in both federal and state courts, to affirm the decision of the district judge. Every presumption is in favor of the correctness of the finding of the trial court upon the facts, if it is a court of general jurisdiction, until the contrary is made to affirmatively appear. (*Altschiel v. Smith et al.* 9 Kan. 63; *James v. Bank*, 7 Wal. 692; *Mullaney v. Humes*, 47 Kan. 99; *Hopkins v. Hopkins*, 47 Kan. 103; *Swift v. Stein*, 13 Pac. Rep. 904; *Bedford v. Ruby*, 17 Neb. 97; *Roele v. Roele*, 15 Neb. 655.)

But the petition, answer and judgment have been properly brought here, and the question arises whether the plaintiff is entitled to relief in this court by way of judgment on the pleadings.

The Code of Civil Procedure of this territory, § 424, p. 830, Statutes of 1893, provides that:

"Where, upon the statement in the pleadings, one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court, though the verdict has been found against such party."

Upon a precisely similar statute in the Code of Civil Procedure of the state of Indiana, the supreme court of that state has repeatedly held that since no such motion having been made at the trial, and the defendant not being thereby notified of defects which he would be entitled to amend in the furtherance of jus-

tice, and since no opportunity was afforded the trial court to consider and decide the question, the sound rule of law is that the question of the right of the party to judgment on the pleadings cannot be first made on appeal. (*Cupp v. Campbell*, 103 Ind, 213; *Dunham v. Courtenay*, 24 Neb. 627; *Fowler v. Bowery Savings Bank*, 113 N. Y. 450; *Wilson v. Fowler*, 9 Kan, 121; *Mo. F. S. & Gulf R. R. Co. v. Duncan*, 20 Kan. 624.)

We hold upon this point that the defendants are entitled to have the judgment below affirmed without looking into the merits of the action.

In its motion to this court for the affirmation of the judgment below without looking into the merits of the action, the defendant assigns as a second reason:

"2. That the record fails to show that either the United States or the persons upon whose relation this action was brought, have any interest in the subject of the action, or would be in any way affected by the construction of the defendant's road over section four, as mentioned in the petition, or are in any way interested in obtaining the relief prayed."

The Code of Civil Procedure of this territory provides, (ch. 66, § 26, p. 767,) that

"Every action must be prosecuted in the name of the real party in interest."    *    *    *

If the relators, therefore, are entitled to prosecute this action, it is because they are the real parties in interest. When the question is one of public right and the object of the proceeding is to compel the performance of a public duty to restrain the commission of a public wrong, the people are regarded as the real party, and the action must be brought in the name of the territory upon the relation of the prosecuting officer, or upon the relation of some member of that public, who has a personal special or peculiar interest in the result as a part of the public.

The decided weight of authority supports the proposition that where relief is sought merely for the pro-

tection of private rights, the relator must show some separate and distinct personal interest in the matter, since he is regarded as the real party and his rights must clearly appear. (High on Extraordinary Legal Remedies, §431; *Pomeroy v. Mayor, Baltimore*, 47 Md. 145; 28 Am. Rep. 446, and note 448; *Dane v. Derby*, 89 Am. Dec. 740, note.)

The interest of the relators must appear in the petition. If it is sought in this action to prevent a wrong to the public, the petition should at least show that the relators are citizens or residents and, as such, are interested in the execution of the laws. If the action is brought by the relators for the protection of private rights, they should show in the petition some personal or special interest in the subject matter. The petition shows neither. The relators are neither described, nor is it shown in any way in the pleadings, that they are citizens, or even residents, of the territory or of the United States. No interest is in any manner exhibited which would entitle them to appear as seeking redress or relief in the preservation of either public or private rights. The relators appear in the action as mere volunteers, and as such are not entitled to the relief sought. (2 High on Injunctions, 1556; *State ex rel. A. T. & S. F. R. R. Co. v. Board County Commissioners*, 11 Kan. 66; *State v. Marston*, 6 Kan. 524; *State v. McLaughlin*, 15 Kan. 183; *State v. Houston*, 6 Ohio 101; *Putnam v. Valentine*, 50 Ohio 107)

It is alleged in the petition that the building of the defendant's line in the manner and at the places to be enjoined, is a public nuisance, and in that case the petition must show that the relators have suffered some special or peculiar injury, independent of, and distinct from, the common and general injury shared by the public alike. No such special or peculiar injury to the relators is alleged or shown in the petition. (2 High on Injunctions, 1555; *Bigelow v. Hartford*

*B. Co.*, 14 Conn. 565; *Doolittle v. Supervisors*, 18 N. Y. 160; *Hinchman v. Paterson H. R. Co.*, 2 C. E. Green 75; *Williams v. Smith*, 22 Wis. 594.)

It cannot be claimed that this is an action in which the United States itself is the real party in interest. If it were in fact so, and this is a proceeding in which the United States is the real party in interest, there would then be a misjoinder of parties. The action would be the action of the United States, in which the relators have been improperly joined.

The petition is verified by each of the relators respectively. This verification has been made in pursuance of the provision of the Code of Civil Procedure, § 108, page 780 of the Statutes of Oklahoma, 1893, which is that:

"In all actions, allegations of the execution of written instruments, * * * duly verified by the affidavit of the party, his agent or attorney, shall be taken as true," etc.

And since the verification does not show that it was made by agents or attorneys, and since the statute provides that such verification of pleadings may only be made by the party, his agent or attorney, it must have been made by the affiants, who being themselves the relators, believed themselves to be, and accepted responsibility as, the real parties in interest.

Before the institution of this suit an agreement was executed by the relators, by which they bound themselves that they would be responsible to the United States for its costs incurred therein.

This agreement was filed with the petition in the district court at the time the suit was brought, as has been stated, and the fact that it was taken by the United States from the relators and that the relators verified the petition in their own behalf as the real parties in the case, abundantly shows that the action, while it was instituted in the name of the United

States of America, was instituted for the benefit of the relators, that it is a suit to protect a private interest, and that the permission to use the name and authority of the United States for the institution of the action was only permitted upon the execution of this agreement, and that the relators, and not the United States, have been the active, interested and real parties in interest, and that the United States was to stand no otherwise engaged, than to protect the interests of the relators themselves.

If the United States had any real interest in the matter in controversy here, it is able, and it is proper that it should be responsible for, and defray its own costs. The attorney general would not, under such circumstances, call upon private persons to secure the United States against the payment of the expenses of litigation on its behalf. The United States comes into court, if it comes at all, upon precisely the same footing, and upon the same conditions, with private persons. It must show its interest. It must show that it has been, or is itself about to be, prejudiced by some action of the defendant or defendants. It must show that it has some pecuniary or other interest at stake. Or, if suit is brought by the United States for the protection of some public interest, or at the relation of private parties for the protection of some private interest, it must appear that there is some obligation subsisting under which it is incumbent upon the United States to litigate in behalf of the public, or of those who offer themselves as relators in the proposed litigation.

If these conditions or some of them do not appear the action cannot be sustained. And it has been declared by the supreme court of the United States that:

"If the fact is manifest that the suit has actually been brought for the benefit of some third person, and

that if no obligation exists which requires the United States to bring it, then the suit must fail. (23 Fed. Rep. 279; *United States v. San Jacinto Tin Co.*, 125 U. S. 285; *United States v. Beebe*, 127 U. S. 338.)

So much has been decided. But is, in fact, the United States the redresser of public or private wrongs? If the federal government is a government of delegated powers, it is incumbent upon the plaintiff to show that some power has been conceded by the constitution or laws to the United States, under which it is authorized to conduct such proceedings as these.

Under our government power goes from the people to the government, and the authority assumed by the attorney general in England to institute, in his own name, proceedings of a character similar to this, as cited to us in the brief of plaintiff, has no existence.

Nor does the practice in the state of Massachusetts, similarly cited by plaintiff upon the authority of the case of *Attorney General v. Algonquin Club*, 157 Mass. 87, aid us. Whatever the authority of the attorney general may be in England, or the practice under a state statute or otherwise may be in Massachusetts, the plaintiffs here are the United States *ex rel.* Search and others, and the attorney general appears, not as the party in interest or as the actor bringing the suit in his own name, but as attorney general acting in the usual capacity of attorney in behalf of the plaintiffs in the case, in the conduct of the legal proceedings in court.

If in fact a public wrong is about to be committed and this action is brought to restrain it, it should be brought, not in the name and upon the authority of the United States, but in the name of the territory, on relation of the attorney general of the territory, or in the name of the Territory of Oklahoma upon the relation of an individual of that public, naming him, who is personally affected by such wrong, and this

interest and damage must affirmatively appear by the petition.

This doctrine has been held by this court in the case of *The Territory of Oklahoma ex rel. W. S. Whittinghill v. C. R. I. & P. Ry. Co.* (1894) not reported.

Upon the considerations herein mentioned, we hold that the judgment below should be affirmed by this court without looking into the merits of the action, because neither the United States nor the persons by whom the action was brought have shown any interest in the subject of the action, or have shown that they are in any way interested in obtaining the relief prayed for.

For a third reason, urged by the defendants, why the judgment below should be affirmed without looking into the merits of the action, the defendant alleges:

"3. For the reason that plaintiffs' cause of action as set out in the petition is based wholly and solely upon the secretary of the interior's alleged disapproval of section four of the route of the defendants' road; that defendants, by their third paragraph of answer, set up an affirmative defense by alleging, among other things, that in addition to the grants contained in said several acts of congress (mentioned in the petition and answer), the defendant, the Choctaw, Oklahoma & Gulf Railroad company, has a right to construct, equip and operate its road over and upon the route designated on the said map of section four under and by virtue of the laws of Oklahoma Territory; that said company, by resolution of its board of directors, entered in the records of its proceedings, designated the route of its said road from the west line of the Seminole nation, Indian Territory, to Fort Reno, Oklahoma Territory, in the manner and as required by the laws of said territory, and filed a copy of such record, certified by the president and secretary of said company, in the office of the secretary of the territory, and caused the same to be recorded as provided by law; that the route designated by said resolution begins at the east end of sec-

tion four, and extends westward to the west end thereof on the route designated on said map of section four, and is in every respect the same route; that to this answer plaintiffs did not file a reply, and thereby admitted said facts to be true, which warranted the judgment of the court below; and for the further reason that the evidence under this paragraph of defendants' answer is not in the record, and this court cannot determine the facts in relation thereto, except as admitted by the plaintiffs' failure to reply to defendants' answer, and the judgment of the court below will be presumed to be in accordance with the evidence "

Section 128, of the Code of Civil Procedure, Statutes of Oklahoma, 1893, .p. 782, provides that:

" Every material allegation of the petition, not controverted by the answer, and every material allegation of new matter in the answer, not controverted by the reply, shall, for the purposes of the action, be taken as true."

Since no reply was filed by the plaintiff, and since the third paragraph of the answer of defendants set forth in this motion constitutes new and affirmative matter, and was not controverted by the reply, its allegations must for the purposes of the action be taken as true.    Whether these allegations constitute such material matter as would of itself be an adequate defense to the action is a proposition which will be hereinafter examined.

It was said by Judge Brewer in *Altschiel v. Smith*, 9 Kan. 90, that inasmuch as there was no information upon what the district judge acted, although there were some copies of affidavits in the transcript and the certificate of the clerk showing that they were on file the day after the decision, and inasmuch as it had been decided in the case of *Backus v. Clark*, 1 Kan. 303, that affidavits on a motion in the lower court to become a part of the record so as to be reviewable by the supreme court must be included in a bill of excep-

tions, that "all presumptions are in favor of the correctness of the decision of the judge of the district court, and we are not placed in possession of the testimony upon which he acted, we have no alternative than to affirm the decision,"

We, therefore, find that the plaintiffs would not be permitted to prosecute this action further for their own benefit without complying with the rule of this court requiring security for cost ; that, while a large number of affidavits, map and opinion accompany the transcript of record, they have not been brought here in such a manner as to enable us to review the evidence; that the affidavits, map and opinion should be, therefore, stricken from the files, and the costs of bringing them here taxed, as prayed in the motion, to the plaintiffs; that the findings and judgment of the district court, having been made upon facts produced in evidence before said court, the judgment cannot be inquired into and reversed owing to the absence of such evidence; that the defendants are entitled to have the judgment affirmed on the pleadings without looking into the merits of the action, no motion for such relief having been made below, and since the application for such relief cannot be made for the first time in this court; and because it does not appear that the United States has any interest in the subject matter of the case, and that the interest of the relators has not been made to appear, either in the subject matter of the litigation, or even that they are residents or citizens of the territory or of the United States. The case will, therefore, and for these reasons, be dismissed and the judgment of the lower court affirmed. This is a legal right of the defendants of which, since they are here demanding it, they cannot be deprived.

It is, however, in view of the great importance of the case and the extensive interests involved, con-

sidered by the court desirable to examine the legal questions proposed in the pleadings and concluded in the judgment of the court below, and to express their views thereon, and this examination will, therefore, now be made.

The sole question in the case is whether, upon the facts presented by the pleadings and the acts of congress therein recited and referred to, the defendant company may proceed to construct and operate its road, notwithstanding the fact that the secretary of the interior on the 15th day of February, 1895, disapproved the map of the proposed new route, except as the same coincides with the old survey, by writing on the map:

"DEPARTMENT OF THE INTERIOR, Feb. 15, 1895.

"The within map is hereby disapproved, except where said line coincides with the line shown upon the original map of the fourth section, filed in the Indian office in 1890."

"(Signed.)          HOKE SMITH, Secretary."

The object must be to discover the purpose for which, and the object to be promoted by, that provision of § 6 of the act of congress of February 18, 1888, which provides:

"That when a map showing any portion of said railway company's located line is filed as herein provided for, said company shall commence grading said located line within six months thereafter, or such location shall be void; and said location shall be approved by the secretary of the interior in sections of twenty-five miles before construction of any such section shall be begun."

The concessions made by the act of congress referred to were made seven years ago. Within this period important political and social changes have occurred in the Indian Territory. In the area of country to which the acts of congress herein recited respectively relate, semi-civilized tribes under the close and paternal

guardianship and protection of the government, and living and holding all their interest in the lands in common under the laws. usages and customs of Indian tribes, trusting to the protection of the United States government, its legislature and its various civil departments, together with its army, for their protection, under all circumstances of negotiation, and at all points of contact with the white race, have given place to the white race itself. Rights of possession and occupancy, and the whole Indian interest, as such, upon this part of the public domain, have been extinguished, and the possession and vested interest in the ownership of the whole country has devolved upon individual Indians who have received allotments of specific portions of the land in which they are now entitled to acquire an absolute and private ownership separate from any ownership in common, or otherwise, with other Indians, and upon individual citizens of the United States, endowed with all the rights, and encumbered by all of the duties provided for, in the homestead act. These changes in the condition of the country must be observed and taken into account. They reflect upon the intention of congress, and upon the purposes for which the various provisions in the acts of congress in question were made.

These circumstances and conditions, including the history of the country, its condition at the time of the passage of the act first referred to, and its condition now, are facts of such an open, known and public character that the courts must take notice of them. (*Winona & St. P. R. R. Co. v. Barney*, 113 U. S. Rep. p. 625; *U. S. v. Denver*, etc., *R. R. Co.* 150 U. S. 1, 14; Sutherland on Statutory Construction, ¶¶ 298, 380.)

The twenty-five miles of land included in section four now in controversy, is built within the territory which became a part of the public domain of the United States by virtue of the Louisiana purchase from France in

1803, and is within Oklahoma Territory as constituted by the act of congress of May 2, 1890, and had been conveyed by the United States to the Creek and Seminole Indians by treaties executed in 1832 and 1833, found upon pages 102-106, of the Revision of Indian Treaties. By subsequent treaties executed March 21, June 14, respectively, in 1866, these nations of Indians receded these lands to the United States "in compliance with the desire of the United States to locate other Indians and freedmen thereon." By a subsequent treaty made with the Creek nation for the purpose of "entirely freeing from any limitations in respect to the use and enjoyment thereof, the interests of the Creek nation were entirely extinguished," and this agreement and treaty was ratified by congress by the act of March 1, 1889, which provided that the lands "thus acquired by the United States, should be a part of the public domain." (25 U. S. Statutes at Large, 757-759.)

A similar release and conveyance was obtained from the Seminole nation. An act, ratifying such release and extinguishment of interest also provided that "the lands thus acquired should be a part of the public domain." (25 Statutes at Large, 1004-1006.)

The lands of the section of country in question, became, by these treaties and conveyances made by the Indian tribes and ratified by act of congress, a part of the public domain, and were held by the United States in fee simple, subject only to a location of the Kickapoo Indians upon the tract, including part of the twenty-five mile section in question, by an executive order of the president made upon August 15, 1883. Upon September 9, 1891, the Kickapoo Indians entered into an agreement to relinquish their occupancy of said land to the United States, which was approved by act of congress March 3, 1893. (27 Statutes at Large, 557.)

Thereafter the president of the United States, having been authorized thereto by the act of congress accepting, ratifying and confirming the said agreement with the Kickapoo Indians, approved March 3, 1893, (27 United States Statutes, 557-563, § 3), issued his proclamation on the 18th day of May, 1895, in which, after reciting that, "by a written agreement, made on the 9th day of September, 1891, the Kickapoo nation of Indians, in the Territory of Oklahoma, ceded, conveyed, transferred and relinquished forever and absolutely, without any reservation whatever, all their claim, title and interest of every kind and character in and to the lands particularly described in article 1 of the agreement, *provided*, that in said tract of country there shall be allotted to each and every member, native and adopted, of said Kickapoo tribe of Indians, eighty acres of land in the manner and under the conditions stated in said agreement;" and that * * * "whereas, allotments of land in severalty to said Kickapoo Indians have been made and approved in accordance with law and the provisions of the before mentioned agreement with them." * * * and that "whereas, all the terms, conditions and considerations required by said agreement made with said tribes of Indians and by the laws relating thereto, precedent to opening said lands to settlement, have been, as I hereby declare, complied with."

The president, thereupon, proceeded to declare that "all of said lands hereinbefore described, acquired from the Kickapoo Indians by the agreement aforesaid, will, at and after the hour of twelve o'clock, * * * on the 23d day of the month of May, 1895, and not before, be opened to settlement under the terms, and subject to all the conditions * * * contained in said agreement, the statutes above specified and the laws of the United States applicable thereto, saving and excepting such tracts as have been allotted, pre-

served or selected under the laws herein referred to, and such tracts as may be properly selected by the Territory of Oklahoma under and in accordance with the provisions of the act of March 2, 1895, hereinbefore quoted, prior to the time fixed herein for the opening of said lands to settlement."

The proclamation referred to, and made a part of it, "A schedule of lands within the Kickapoo reservation, Oklahoma Territory, to be opened to settlement by proclamation of the president."

And a further provision was made, attaching the lands of the Kickapoo reservation, then opened, to the Eastern land district and Oklahoma land district, both of Oklahoma Territory.

The allotments therein referred to, were the allotments of land in severalty to individual Indians, to be held by each of them respectively, not as parts of an Indian reservation, nor as Indian lands, nor to be held under the laws, usages and customs of Indian tribes or nations. The Indian interest, as such, was wholly extinguished. The reservation, as such, was obliterated. The tribal unity was destroyed; together with the tribal rights of ownership and occupancy. The Indian allottee became an individual owner of the separate tract of land allotted and set apart to him under the treaty referred to, subject only to the provision that the secretary of the interior should hold the land in trust for his use and benefit, and that they should be incapable of alienation for the period of twenty-five years.

The surveillance, protection and control of the United States government, mainly through the secretary of the interior, over the rights of the Indian to his land then allotted, which has been uniformly likened by the courts to that of a guardian over his ward, ceased. He and his rights passed, subject to the provisions mentioned, under the protections of the common law,

of the laws of the United States, and the laws of this territory, and he became entitled to all the rights and subject to all the duties of a resident, and probably to those, also, of a citizen of the United States and of the Territory of Oklahoma.

It is contended by the defendants in error, that §§ 3, 5 and 6 of the act of 1888, are applicable only to the Indian Territory as it is now, at the time of the hearing of this case, constituted; and that these sections were incorporated into the act for the protection of the Indian tribes, and individual occupants of these tribes, which would be inapplicable to country owned and controlled absolutely by the United States. We do not find that this contention can be sustained. At the time of the passage of the act of 1888, all of the territory now comprised within the boundaries of Oklahoma Territory, together with that portion or country now included within the boundaries of the Indian Territory, constituted but one territory under the name of the Indian Territory, and when in that act, the Indian Territory is spoken of, we understand it to refer to the whole body of land included within the boundaries of the Indian Territory, as it then existed. We do not understand that the mere fact of the separation of a portion of that territory, and its erection into the new Territory of Oklahoma, by the act of congress of May 2, 1890, releases the Choctaw Coal and Railway company or its successor, the defendants in this case, from the performance of any of the conditions and requirements which are imposed by the act of 1888. We cannot hold that the conditions stipulated for in the sections of the act of 1888 referred to, apply the less to the territory so separated, because it happens to be included within the boundaries of the Territory of Oklahoma. When the act undertook to provide "full compensation for any lands held by individual occupants, according to the laws,

customs and usages of any of the Indian nations or tribes" through which it may be constructed, together with other conditions, including "the payment of fifty dollars per mile to the secretary of the interior," etc., and the provision that "congress should have the right so long as said lands are occupied and possessed by said nations and tribes, to impose such additional taxes on said railroad as it may deem just and proper for their benefit," these provisions did not relate solely to those lands which belong to the Indians by a fee simple title executed to them by the United States government, but that they also applied as well to such tribes as the Kickapoos, who were located upon a part of the public domain of the United States with the simple right of possession and occupancy, subject to executive order. And when by the act of congress of February 13, 1889, by which § 1 of the act of 1888 was amended, the Choctaw Coal and Railway company was authorized to construct and operate its railway through that portion of the Indian Territory occupied by the Kickapoo tribe, the land in question in this case, and now a part of the Territory of Oklahoma, by the most feasible and practicable route to an intersection with the Atchison, Topeka & Santa Fe railway, it was an amendment of a single section of the act of 1888, and being such, was made and accepted, as an amendment only, of the original act subject to all the other provisions and conditions of the act of 1888, as they then stood unaltered and unchanged. Individual occupancy of lands, was in pursuance of and a part of, the laws, customs and usages of the Indian tribes who occupy the public domain of the United States under executive order, as it was also, of tribes occupying such lands as were held in fee simple by the tribe itself.

That this was the meaning and intention of congress is manifest from the repeated provisions in the

act itself, with reference to Indian occupancy, and which provide that congress shall have certain rights, "so long as said lands are occupied by said Indians and tribes," so that the legislation related, not to lands which were owned by said Indian tribes, but to lands which were in the occupancy of such tribes.

Nor did the passage of the act of August 24, 1894, by congress, providing for the organization of the defendant company as the successor of the Choctaw Coal and Railway company, have the effect to render nugatory, or to abridge, the extent or force of the conditions and requirements of the act of 1888, relating, as those provisions and conditions of that act, including those of February 13, 1889, did, to the whole extent of the defendant's railway, including that portion now included within the Territory of Oklahoma, as well as that portion now included within the Indian Territory as it is at present constituted. The concessions and authorizations were made to the defendant company in 1894, subject to the provision that they should, as provided in § 5 of the act of that date, be done "in conformity with the provisions of the acts of congress, relating to or affecting the Choctaw Coal and Railway company." We hold this view conclusively, upon these considerations and upon the provision of the Organic Act constituting the territory, by which it is, in a conditional clause which forms a part of the first section of that act, passed May 2, 1890, stipulated:

"That nothing in this act shall be construed to impair any right now pertaining to any Indians or Indian tribe in said territory under the laws, agreements and treaties of the United States, or to impair the right of personal property pertaining to said Indians, or to affect the authority of the government of the United States to make any regulation or to make any law respecting said Indians, their lands, property or other rights which it would have been competent to make, if this act had not been passed."

If, then, it should be found that §§ 3, 5 and 6, of the act of 1888, were intended for the protection of the rights of any Indians or Indian tribe in the said territory, that is, the Indian Territory, whether those rights existed among the Indians or Indian tribes who owned and occupied their lands, or as they related to Indians or Indian tribes who merely occupied and were in possession of certain portions of the public domain under executive order from the president, this provision of the Organic Act thus plainly provides for their preservation and protection as they existed at the time of its adoption.

We do not now treat of the applicability or inapplicability of the sections of the act of 1888 referred to, as applied to the changed conditions of the country, but do announce it as our opinion that the act of 1883 was applicable to the land in question in this case, for all the purposes and protections intended in that act, notwithstanding the fact of the change of political organization and the erection of the new Territory of Oklahoma, including the land through which the section of twenty-five miles herein referred to, extends designated as section 4, and as applicable alike to defendant, as originally to the Choctaw Coal and Railway company itself, throughout the whole extent of the line built under and by virtue of the act of 1888, as well in the Indian Territory as now constituted, as in that portion of the Indian Territory as it then existed, which has since been erected into the Territory of Oklahoma.

It is, in the next place, urged by the defendant railroad company, that the acts of congress gave to it the sole right of selecting its own route, of locating its own line, and of determining for itself, what was the most feasible and practicable route therefor, and that if it observed the conditions prescribed for it, by those acts of congress, that having accepted the

granted powers, and entered upon its work, it has the
right to build its line notwithstanding the fact that
the secretary of the interior may withhold his ap-
proval of the route as selected.

By the act of February 18, 1888, the Choctaw Coal
and Railway company was "hereby invested and em-
powered with the right of locating, constructing * * *
a railway * * * line through the Indian Terri-
tory * * * by the most feasible and practicable
route."

It was by § 5 provided that, also: "If the gen-
eral council of either of the nations or tribes through
whose lands said railway may be located, within four
months after filing the maps of definite location, as
set forth in § 6 of this act, dissent from the allowance
hereinbefore provided for * * *" and by the last
clause of § 5 of the same act it was provided, that
"said railway company shall have the right to survey
and locate its railway immediately after the passage
of this act."

And it is by § 6 provided that:

"Said company shall cause maps showing the route
of its located lines through said territory to be filed
with the secretary of the interior."

By the act of February 13, 1889, it was again pro-
vided:

"That the Choctaw Coal and Railway company,
* * * is hereby invested and empowered with the
right of locating, constructing, * * a railway * *
line through the Indian Territory, and thence by the
most feasible and practicable route to an intersection
with the Atchison, Topeka & Santa Fe railway, * *
otherwise known as a point on the north fork of the
Canadian river."

The power given by these acts was by the act of
August 24, 1894, vested in the defendant railroad
company with "all the powers, rights, immunities,

privileges and franchises which have been heretofore
granted to, or conferred upon, said company by any
act or acts of congress."

To locate, is defined in Webster's dictionary as "to
place; to set in a particular spot or position." It is
defined in Stormonth's dictionary as, "to set in a par-
ticular place or position." It is defined in the Century
dictionary as, "to determine the situation or limits;
to locate a tract of public land by surveying it and
defining its boundaries."

When, therefore, the rights and privileges of the
Choctaw Coal and Railway company devolved upon
its successor, the defendant company, it was invested
and impowered with the right of setting its railway
line in a particular spot or position; with the right
of fixing the place of its railway line, and of deter-
mining its situation, of surveying the place where it
was to go, and defining its boundary, unless, indeed,
it should eventually be determined that the clause of
§ 6 of the act of 1888 providing that, "said location
shall be approved by the secretary of the interior in
sections of twenty-five miles before the construction
of any such section shall be begun," should be con-
strued to authorize the secretary of the interior to de-
feat the right of surveying and locating its railway
immediately after the passage of that act, and with
which the defendant company was "invested and
empowered," notwithstanding that the defendant
company had, as appears by the pleadings, fulfilled
all the conditions stipulated in the said acts of con-
gress, and notwithstanding that such withholding of
approval should be derived from some matter or cause
wholly outside of, and disconnected with, the provis-
ions of the acts of congress by which the authority
and power to "locate" were given.

The view here taken is one which, while seeming to
require no support, is in fact corroborated by the

general rule, which is that, "where a railway corporation is formed under a special charter authorizing it to construct its road between certain points; the right of selecting the route and location of the road is left to its discretion, and the question whether its charter warrants the location as recorded, is one of judicial construction for the courts. But neither a court of equity nor of law will attempt to control the exercise of this discretion within the designated *termini*." (2 Beech on Injunctions, § 1332; 2 Woods Railway Law, § 237; *Southern Minn. R. R. Co v. Stoddard*, 6 Minn. 150; Parke's Appeal, 64 Penn. St. 137; *Hentz v. Long Island R. R. Co.* 13 Barb. [N. Y.] 646; *Cleveland, etc. R. R. Co. v. Speer*, 56 Penn. St. 325; *Struthers v. Dunkirk R. R. Co.* 87 Penn. St. 282; *People v. N. Y. R. R. Co.* 74 N. Y. 302.)

And upon an act of congress containing a like provision authorizing the Kansas Pacific Railway company to "locate" its line, it was said by the supreme court of the United States, in the case of the *Kansas Pacific Railway Co. v. Dunmeyer*, 113 U. S. 629, that:

"We are of opinion that under this grant, as under many other grants containing the same words or words of the same purport, an act which fixes the time of definite location, is the act filing the map or plat of those lines in the office of the commissioner of the general land office. * * * After this no such rights can be attached, because the right of the company becomes by that act vested. * * * The company makes its own preliminary and final surveys by its own officers. It selects for itself the precise line on which the road is to be built, and it is by law bound to report its action by filing its map with the commissioner, or rather, in his office. The line is then fixed."

It is, however, contended by the plaintiff in error, that if the approval by the secretary of the interior was not necessary, the filing of the map in 1890 fixed the location. This contention takes no account of the changed conditions of the country, of the extinction

of the Indian interest, and of the interest of the
United States in the land as a part of the public
domain, nor can it be sustained in view of that pro-
vision of § 6 of the act of 1888, which provides:

"That when a map showing any portion of said
railway company's located line is filed as herein pro-
vided for, said company shall commence grading said
located line within six months thereafter, or such
location shall be void."

Nor could the stipulation endorsed by the secretary
of the interior on February 15, 1895, upon the map
filed by the defendant company in the department of
the interior in December, 1894, to the effect that:
"The within map is hereby disapproved, except where
said line coincides with the line shown upon the
original map of the fourth section filed in the Indian
office in 1890," have any effect to restore to the de-
fendant company the right to build upon the line
upon which it was expressly declared by congress that
such location should become void if not built upon
within six months after filing its map of location.

It is further contended by the plaintiff in error that
the filing of the map in 1890, known as the old survey,
exhausts the power of the company to file, and it
could not make a new selection.

While it is provided that. if the company locates
the line, it must commence grading said located line
within six months thereafter, or the location shall be
void, this provision does not take away the right of
the defendant company to make a new location, or to
build its line thereafter, under the act of 1888, by
which it was provided, in § 9, that "said railway com-
pany shall build at least one hundred miles of its rail-
way, in said territory, within three years after the
passage of this act, and complete the main line of the
same, within said territory, within one year there-

after, or the rights herein granted shall be forfeited as to that portion not built."

Under the acts of congress of February 21, 1889, and of January 22, 1894, it was provided that "the time for the construction of the railway of the Choctaw Coal and Railway company * * * shall be extended for the period of two years from that date, so that said company shall have until February 18, 1896, to construct the lines of railway authorized by the act approved February, 1888." The provisions of § 6 of the act of 1888, by which a particular location is made void if not graded upon within six months after filing the map of its located line, was doubtless intended for the benefit of such Indians as, being individual occupants, should desire to make improvements subsequent to the filing of the original plat, and was a condition intended to provide compensation for such additional improvements to the Indian so making them upon the proposed right of way, if the railroad company should not proceed, within the six months specified, to build its line then located, and was not intended to defeat the final and complete building of the line, and to make new selections of location, if, by reason of not having begun grading thereon, a location formerly made should become void.

The provisions made in the first section of the act of 1888, that the company was invested and empowered with the right of locating * * * "by the most feasible and practicable route," was a provision intended, not to promote the interests of the Indian tribes or nations through whose lands the line was then being projected, nor for the benefit of the United States, which could have no interest in the matter, but was a provision for the benefit of the railroad company that it might provide the most economical line, and that which would be the most beneficial to the commercial objects and purposes which it had in view,

and for the cheaper and more advantageous transportation of the persons and property of the public. It had the means to make such selection, and to correctly ascertain what was in fact the most feasible and practicable route.

The judge of the district court, in reviewing and summing up the testimony produced before him by the expert engineers, who were selected by the secretary of the interior to go over and examine and report to him the various routes surveyed, as well as a number of civil engineers and persons having knowledge of the matter, "testified that the line in question is the most feasible and practicable route." The conclusions, based upon this statement of the testimony, will, in the absence of the testimony, be affirmed here.

The act of congress upon that point has, therefore, been complied with, as is also stated by the defendant company in its answer in the case. If the fact had been ascertained and the findings made by the court that the railroad company had, in fact, not built its line by the most feasible and practicable route, it would, indeed, have formed a reason upon which the secretary of the interior might have acted in disapproving the location, for it has been repeatedly decided by the supreme court of the United States that railroads are, for many purposes, public highways, in which the convenience of the public as to transportation of persons and property must be consulted, and that their construction should be made without unnecessary length between the *termini* designated in the acts authorizing them, and that the road should be constructed upon the most direct and practicable line, and that no unnecessary deviation from such line should be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant. (*Woodstock Iron Co. v. Richmond*

& D. E. Co. 129 U. S. 643; *United States v. Northern Pac. R. R. Co.* 152 U. S. 292.)

In determining the purpose of the act of 1888, it must be observed with regard to the condition of the Indian Territory that at that time the whole of it was set apart for the occupancy of Indian tribes and nations alone. White men were rigidly excluded from it, except upon terms which were carefully provided by the Indian Intercourse act found in the Revised Statutes of the United States. This Intercourse act was administered by the interior department, under the general direction of the secretary of the interior. Persons other than Indians were permitted to trade, and to have limited commercial privileges within the territory, only under regulations provided by that act, and by such further regulations as should be found necessary by the secretary of the interior himself, or by the commissioner of Indian affairs. But under no circumstances were white men permitted to acquire any interests in land within any portion of the Indian Territory, except for certain temporary and limited purposes under the limitations of the Indian Intercourse act, and the regulations provided thereunder. And it will be found upon a careful consideration of the act of congress of 1888, and of the subsequent acts under which the defendant company was authorized to build its line, that all the conditions imposed by congress upon the Choctaw Coal and Railway company and its successor, the defendant company, were provisions intended solely for the protection of the Indian interests in the land, except such as are intended for the protection of the railroad company itself.

It was provided by the original act of 1888 that (1) the corporation is authorized to use a right of way one hundred feet in width through said territory, and (2) for all purposes of railway, and for no other purpose, and (3) to take and use a strip of land two hun-

dred feet in width with a length of three thousand
feet, in addition to the right of way, for stations,
for every ten miles of road, and (4) the right to use
additional ground where there are heavy cuts or fills,
as may be necessary for the construction and main-
tenance of the roadbed, not to exceed one hundred
feet in width on each side of said right of way, and
(5) that no more than such addition of land shall be
taken for any one station, and (6) that no part of the
lands authorized to be taken should be leased or sold
by the company, and (7) that they should not be used
except in such a manner and for such purposes only as
should be necessary for the construction of said rail-
road, and (8) that when any portion thereof shall
cease to be used, such portion shall revert to the
nation or tribe of Indians from which the same shall be
taken, and (9) that full compensation shall be made to
individual occupants, according to the laws, usages
and customs of any of the nations or tribes through
which it might construct its road, and (10) that in
case of failure to make amicable settlement, com-
pensation was to be determined by the appraisement
of three referees, one to be appointed by the president,
one by the chief of the nation to which the occupant
belongs, and one by the railway company, together
with provisions for appeal to the district court, and
(11) that upon the hearing of the appeal if judg-
ment was for a larger sum than the award of the
referees, the costs of appeal were to be assessed
against the railway company, and (12) that when
proceedings were commenced in court, the railway
company was to pay double the amount of award into
court, to abide the judgment thereof, before having
the right to enter upon the property, and (13) that the
railway company was to pay to the secretary of the
interior for the benefit of the particular nations or
tribes through whose lands said railway may be

located, the sum of fifty dollars, per mile in addition to compensation provided for in this act.

Other conditions of the act, not here recited, indicated with equal clearness that the conditions exacted from the railroad company were for the benefit and protection of Indian interests alone. Other provisions of the act exhibit with equal force that the right of way which the company was by that act authorized to locate had reference to lands which either belonged to Indian nations or tribes, or were in their occupancy, and to no others.

It is provided in the act referred to, in the last clause of § 2. that (1) "when any portion thereof (that is. of the lands over which the right of way has just been granted) shall cease to be used, such portion shall revert to the nation or tribe of Indians from which the same shall be taken," and (2) that "congress shall have the right, so long as said lands are occupied and possessed by said nations and tribes," etc., and in § 7, (3) that the servants of the company may reside "upon the right of way," but subject to the provisions of the Indian Intercourse laws, and such rules and regulations as may be established by the secretary of the interior, in accordance with said Intercourse laws, and (4) concurrent jurisdiction is provided over controversies arising between said railway company and the nations and tribes through whose territory said railway shall be constructed, in the United States circuit and district courts for the Western district of Arkansas and the Northern district of Texas, [it being here observed that jurisdiction over controversies is provided for between the railway company and the Indian nations or tribes alone, and not between either of them and any white citizen or citizens of the United States,] and (5) that all mortgages executed by the railway com-

pany upon any portion of its railroad were to be recorded in the department of the interior.

No conditions precedent to the right to build the road, are to be found in the act of 1888 and those which follow it, except such as provided for the protection of the Indians, or granted authority to the railroad company. The railroad company, then, accepted the grant upon the conditions therein provided, and no others. It had the right to rely upon the grant of powers made to it, upon condition only that it should fulfill and comply with the precedent conditions upon which the powers were granted.

The company, having accepted the conditions upon which it was provided that it might build its line in the Indian Territory, and having entered upon its location and construction, had a right to locate and construct its line without the imposition of further conditions. Congress itself would have no right to impose them, unless it should undertake to do so under the power reserved in the act itself, "to amend, add to, alter, or repeal this act," a reservation of authority which does not exist in the secretary of the interior.

It is apparent from the allegations of both the petition and answer that the cause of the secretary's disapproval of the location of section four, was that, "there was a difference between the Choctaw, Oklahoma & Gulf Railroad and the people of Tecumseh in regard to the location of their line. * * * Two lines were run by the road in the neighborhood of Tecumseh, one through Tecumseh, and the other about six miles north of Tecumseh." The railroad company's right to build the line nearest to Tecumseh had become void before the time that the land upon which Tecumseh is built was opened to settlement. It would have had no right to build on that location without making a new survey, map and location. While the motive of the secretary of the interior arose, without doubt,

from a sincere desire to protect the interest of that city, and of its people, we cannot find that the duty approving, or the right of disapproving, can be gathered from any other source than from the terms of the act which authorized the railroad company to build its line, and under which it did build it from a point eastward to the eastern terminus of section four, and from a point westward to the western terminus of section four, thus leaving a most important breach which would remain unbuilt and destructive to a great degree of the value of the eastern and western sections of the line, if the completion of the road could be defeated, by reason of the consideration given by the secretary to interests which were not established at the time of the passage of the act of 1888, and could not have been in the contemplation of congress at that time.

The government, too, of the United States, had a right to exact of its grantee the full performance of those conditions. It had a right to make such a provision as would secure their performance. That provision was made in the sixth section of the act of 1888, that "said location shall be approved by the secretary of the interior in sections of twenty-five miles before construction of any such section shall be begun."

We understand that this provision, authorizing the secretary of the interior to approve the location, imposed a duty upom him which was to see that the map and location were in compliance with, and in conformity to, those conditions which congress had, in the act of congress authorizing it to build, imposed upon the railway company. We do not understand the secretary of the interior to have been charged with any other duty, or to have had any matter involving discretion imposed upon, or committed to, him. We believe this to have been the extent of the authority reposed in the secretary of the interior by this act. If

so, the function committed · to him was ministerial only, and not judicial.

It is alleged by the answer and not denied by the plaintiff and it is admitted for the purpose of this discussion that the conditions had all been .complied with, and with great respect for the secretary of the interior, we believe that whatever may be the character of the "approval" required of him by other acts of congress charging him with the exercise of discretion, we do not believe that the authority committed to him by this act was any further or other, than to ascertain if the conditions of the act had been complied with, and that the duty can be interpreted no other or larger than ministerial only, and so holding we shall find that the conditions of this act had been complied with and that the railway company was entitled to have the approval by the secretary of the interior under the direction of the act, that "said location shall be approved before construction of any such location shall be begun."

We hold that the defendant company having fulfilled all the conditions required of it by the act of congress under which it was built, should not be restrained from building its line by the withholding of his "approval" by the secretary of the interior.

In order to show that the "approval" of the secretary of the interior was an essential prerequisite to the building of the road upon the location selected, the plaintiff in error has cited the cases of *Buttz v. Northern Pac. R. R. Co.* 119 U. S. 55; *New Orleans & Pac. R. R. Co. v. Parker*, 143 U. S. 57; *United States v. Mo. Ry.* 141 U. S. 374; *Kan. Pac. R. R. v. A., T. & S. F. R. R.* 112 U. S. 414; *Williams v. United States*, 138 U. S. 514; *Miller v. Mayor New York*, 109 U. S. 385.

All of these cases, except the last two named, relate to concessions from the United States to railroad com-

panies, of alternate sections of the public lands.   In the acts of congress, respectively, by which the grants of land were made, it is provided that selections shall be made "under the direction of the secretary of the interior," or that he shall "cause to be selected," or that it "shall be the duty of the secretary of the interior to select," the respective sections to be conveyed to the railroad companies, and in doing so, to determine whether or not there still remains a deficiency in the grant, whether the particular public lands desired by the railroad company could properly be taken, or whether any lands within the limits prescribed had been disposed of to settlers under the land laws of the United States, and if so, to determine what lands should be selected and granted, to the railroad company in lieu thereof.

In the case of *Williams v. United States*, the plaintiff had sought by a gross fraud to secure the conveyance of a portion of the public lands, and to use the rights provided under the land laws of the United States, to aid him in the perpetration of this fraud.   In order to complete the fraud it was necessary that he should secure the "approval" of the secretary of the interior, which was properly withheld, the supreme court, by Brewer, J., saying that:

"We do not mean to imply that any arbitrary discretion is vested in the secretary; but we hold that the statute requiring the approval by the secretary of the interior, vests a discretion in him by which wrongs like this could be righted; and equitable considerations, so significant and impressive as this, given full force."

The case of *Miller v. Mayor of New York* arose under an act of congress, (15 U. S. Statutes at Large 336), giving to the secretary of war supervision of the construction of a bridge across the Hudson river.   The navigation of that river being of the highest importance, the act required that the bridge company should

furnish all the necessary evidence including the specifications of the bridge, and of the condition of the stream, and such evidence as the secretary of war might need to enable him to determine whether or not the bridge as proposed would obstruct navigation. In all of these cases discretion was expressly committed to the secretary, and its exercise was necessary, and in each instance the "approval" of the secretary of the interior, or of the secretary of war, were held to be necessary. But these cases do not aid us in the interpretation of a statute which commits no duty to the secretary, except to see that the conditions prescribed in the act, imposing the duty upon him, are fulfilled, where no discretion is given to the secretary of the interior, and where no gross fraud upon the government or upon individuals has been alleged or sought to be perpetrated.

After the order made by the district court on the 23d day of May, 1895, in which, at the instance of the plaintiff, the district court undertook to set aside the final judgment which it had rendered in the case on May 1, 1895, in the absence of, and without notice to, the defendant, the defendant on the 25th day of May, 1895, filed its motion for a new trial, which application was upon the same day by the court overruled, and leave granted to the defendant to file its supplemental answer in the case, at that time tendered to be filed, and an order made that the same should be filed as of May 23, 1895, and made a part of the record in the case.

In this supplemental answer the defendant sets up that, "the Kickapoo reservation had, since the order of May 1, 1895, dissolving the injunction, been opened to homestead settlement by a proclamation of the president; that said country had been opened to settlement on the 23d day of May, 1895, and thereupon

ceased to be in any sense an Indian reservation, or a reservation of any 'kind."

It is by the defendants strongly urged in argument that, by reason of their compliance with the general laws of Oklahoma Territory applicable to railroads, it is now entitled to take advantage of these laws, and to build its line without the approval of the secretary of the interior, since these laws do not require such approval. As appears by the proclamation of the president referred to, the Kickapoo nation of Indians, through which that portion of "section four," in question, is located, "conveyed, transferred and relinquished forever and absolutely, all of their claim, title and interest of every kind," to those lands, and that this agreement was ratified and confirmed by act congress approved March 3, 1893.

The allotments of land of eighty acres each, to individual Indians, provided for in that act, having been made, the president, as has been stated, upon the 18th day of May, in the year 1895, declared that the lands of the reservation, not already appropriated as such allotments by individual Indians, would be opened for settlement under the homestead laws of the United States on the 23d day of May, 1895. These lands thereby became a part of the Territory of Oklahoma. By the contract of September 9, 1891; by the act of congress ratifying the same; by the making of the allotments therein provided for, and by the proclamation of the president, the rights of individual occupancy were extinguished, and the lands of the whole reservation became subject to the laws of the Territory of Oklahoma, subject only to the provision and the agreement referred to, and "when the allotments of land shall have been made and approved by the secretary of the interior, the title thereto should be held in trust for the allottees, respectively, for the period of twenty-five years in the manner and to the

extent provided in the act of congress approved
February 8, 1887." (24 Statutes at Large, 388; *Buttz v.
Northern Pacific R. R.* 119 U. S. 55.)

By § 26, of art. 9, ch. 17, of the Statutes of Okla-
homa, 1893, upon "Railroad Corporations," it is pro-
vided:

" Any railroad •corporation chartered and organized
under the laws of the United States, or any state or
territory, whose constructed roads shall reach and
intersect the boundary line of this territory at any
point, may extend its road into this territory from any
such point or points to any place or places within the
territory, and may build branches from any point on
such extension."   *   *   *

It is alleged in the answer, and· not denied by the
plaintiff, that the defendant company has complied
with all the requirements of this statute, which en-
title it to the benefits therein provided.

By § 9 of the same article, it is provided that:

"Every railroad company so authorized to con-
struct, operate and maintain a railroad in this terri-
tory, shall have the power, first, to make surveys,
*   *   *   fourth, to lay out road, and fifth to construct
its road."   *   *   *

The defendant company is entitled to the provisions
and benefits of the general railway laws of the Terri-
tory of Oklahoma to the same extent as if it had been
incorporated under the laws of a state or territory.

In the case of the *United States v. Denver, etc. R. R. Co.*
150 U. S. 14, a case in which the railroad company
having been incorporated under a special act, claimed
the benefit of the general railroad law of the United
States passed in 1875, the court says:

"Upon what principle does the enjoyment by the
defendant of the rights and benefits conferred by the
earlier special act, preclude or estop it from accepting
the benefits offered by the later general act after

the special rights and privileges had terminated.    We know of no such principle."

In the case of *Centl. Branch U. P. R. R. Co. v. A. T. & S. F. R. R. Co.* 26 Kan. 669, it was said by the court, Brewer, J.:

"The question simply is whether a specially chartered corporation can avail itself of the general procedure established by law for all railway corporations, and the question must be answered in the affirmative."

We, therefore, hold that the Choctaw, Oklahoma & Gulf Railroad company was authorized by the acts of 1888 and 1894 to locate its own line through the section of country wherein "section four" is built, and has located its line by the most feasible and practicable route, and inasmuch as the right of location and construction were dependent only upon the performance of the conditions set forth in the acts, and that these conditions were for the protection of the Indian tribes and nations or of Indian occupants under the laws, customs and usages of the Indian tribes or nations, and that the defendant company has fully complied with the conditions, that the defendant company is invested and empowered with the right to locate and construct its line, and to the "approval" of the secretary of the interior therefor, and that, the Indian interest having been extinguished, the land became subject to the laws of the Territory of Oklahoma, without the intervention of the limitations of the Indian Intercourse act, and that the defendant company, having complied with the provisions of the laws of this territory authorizing the laying out and construction of railways, is entitled to locate and construct its line thereunder, and that the "approval" of the secretary of the interior is not necessary under the provisions of this act, and that injunction will not lie to restrain the defendant railroad company from building its line without such approval.

The judgment of the district court is, therefore, affirmed.

Scott, J., having presided in the trial of the cause below, not sitting; all the other Justices concurring.